**Robert GALLIONE, Plaintiff–Appellant,**

v.

**Joseph FLAHERTY, Individually and as President of Utility Workers Union of America AFL–CIO, and Utility Workers Union of America Local 1–2 AFL–CIO, Defendants–Appellees.**

No. 132, Docket 95–7159.

United States Court of Appeals, Second Circuit.

Argued Sept. 6, 1995.

Decided Nov. 17, 1995.

Abraham Hecht, Forest Hills, New York, for Plaintiff–Appellant.

Irwin Geller, Flushing, New York (Seth L. Goldstein, Flushing, New York, on the brief), for Defendants–Appellees.

Before: FEINBERG, KEARSE, and LEVAL, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Robert Gallione, a former officer of defendant Local 1–2, Utility Workers Union of America, AFL–CIO (the "Union" or the "Local"), appeals from a judgment of the United States District Court for the Eastern District of New York, Raymond J. Dearie, *Judge*, dismissing his claims against the Union and its president under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and state law for

pension benefits under an unfunded supplemental pension plan previously maintained by the Union. The district court granted defendants' motion for summary judgment dismissing the complaint, holding principally that since participation in the plan had been limited to a select group of Union officers, it was a so-called "top hat" plan that was not subject to ERISA's vesting requirements and Gallione thus had no vested rights in it. The court also ruled, *inter alia*, that ERISA preempted Gallione's state-law contract claim. On appeal, Gallione contends principally that the district court erred in construing the plan in question as a top hat plan and in concluding that his contract claim was preempted. For the reasons below, we affirm the judgment.

## I. BACKGROUND

The material facts are largely undisputed. The Union represents approximately 12,000 employees of the Consolidated Edison Company of New York, Inc., 300 employees of the Power Authority of the State of New York, and 100 employees of other companies. At the pertinent times, the Union had 22 full-time officers, including 12 business agents. The Union also had five other full-time employees, and it had 41 part-time officers, including four vice presidents and 37 members of an Executive Board; the part-time officers were also active employees of the companies whose employees the Union represents. The full-time officers, one of whom was *ex officio* a member of the Executive Board, were responsible for initiating and implementing Union policy, subject to the approval of the membership. The membership met in general session four times a year; between those general meetings, the important decisions were made by the Executive Board, usually based on reports and recommendations from the Union's full-time officers. The full-time officers, with the assistance of the part-time officers, shop stewards, and others, were responsible for negotiating collective bargaining agreements. The full-time officers were also responsible for most of the Local's daily business. Gallione held the full-time office of Union business agent from 1971 until August 1990, when he

and the other members of his faction were voted out of office.

At all pertinent times, the Union maintained an employees' retirement plan ("Retirement Plan") that consisted of individual accounts for each full-time Union employee. The Retirement Plan was funded with annual contributions by the Union of amounts equaling 20 percent of each employee's salary. These payments were made to a trust whose assets were kept separate from the Union's general assets and were administered by trustees. Gallione was a participant in that plan.

In 1977, the Union adopted a supplemental pension plan (the "Supplemental Plan"), participation in which was limited to the Union's full-time officers. Under this plan, as amended in 1983, a full-time officer leaving office at the age of 62 would be paid a monthly sum calculated by multiplying $40 by the number of years of his continuous service as a full-time Union officer; those leaving office between the ages of 45 and 62 would receive somewhat smaller monthly amounts. The Supplemental Plan was administered by the Union and was unfunded; benefits thereunder were to be paid solely from the general assets of the Union. In March 1978, in an alternative-method-of-compliance statement filed with the United States Department of Labor ("DOL"), *see generally* 29 U.S.C. § 1030, the Union stated that the Supplemental Plan was maintained

primarily for the purpose of providing deferred compensation for selected management or highly compensated employees (22 included in the program as of December 31, 1977). The subject program is unfunded and benefits thereunder will be paid as needed solely from the general assets of the employer.

The Union never made filings with DOL under ERISA with respect to the Supplemental Plan and was never asked by DOL to do so. DOL recorded the Supplemental Plan as a top hat plan.

In the late 1980s, the Union began to experience financial difficulties, and steps were taken both by the incumbent officers and by the membership to terminate payments under the Supplemental Plan. First,

in 1989, Eugene Briody, who held the full-time office of business manager, pledged to eliminate the Supplemental Plan, and he obtained the approval of the Union's Executive Board to suspend payments to new claimants under that plan and to study the financial implications of continuing the plan. Second, the Union's major dissident group proposed a bylaw amendment that would eliminate the Supplemental Plan. The incumbent officers did not oppose elimination of the Supplemental Plan but rather took credit for having already, in effect, discontinued it. Thus, in "AN OPEN LETTER FROM YOUR UNION OFFICERS," the incumbents argued that the supplemental pension issue raised by the dissidents was a red herring because "when Gene Briody took the leadership of this union he had that pension suspended." Gallione was one of the officers whose names were given as the authors of this open letter.

The proposed new bylaw, eliminating the Supplemental Plan for all officers who retired after the vote on the amendment, was adopted by a Union membership vote of 2,851 to 684 in April 1990. Accordingly, in a May 11, 1990 letter to the Union membership "on behalf of all of the officers of the Local," Briody confirmed that "present and future officers are not to have 'supplementary' pensions."

In August 1990, Gallione, along with others in his faction, was voted out of office. He was paid a lump sum benefit of $295,000 from the Union's Retirement Plan. In August 1991, he applied to the Union for a pension under the Supplemental Plan, seeking additional payments of $780 a month. His application was rejected because the Supplemental Plan had been terminated by the April 1990 vote of the membership.

Gallione commenced the present action alleging, *inter alia,* that the denial of his application violated his rights under ERISA. Following a period for discovery, both sides moved for summary judgment. In a Memorandum and Order dated January 10, 1995 ("District Court Opinion"), the district court denied Gallione's motion and granted that of defendants. Noting that "[t]he parties agree that if the Supplemental Plan was a top hat plan, Mr. Gallione is not entitled to benefits

under ERISA," District Court Opinion at 6, the court stated as follows:

> The Supplemental Plan was indeed a top hat plan. Significantly, a qualified plan already protected full-time employees at the time the Supplemental Plan was introduced. The Chairman of the Executive Board filed an alternative method of compliance statement with the Department of Labor stating explicitly that the Supplemental Plan was a top hat plan and the Department of Labor certified the Supplemental Plan as a top hat plan. In addition, the filings that the Local made with the Internal Revenue Service explicitly state that the Local did not have a second qualified pension plan.

*Id.*

The court rejected Gallione's contention that the group of persons covered by the Supplemental Plan was not sufficiently limited to constitute a "select" group within the meaning of the pertinent sections of ERISA. Noting that the underlying facts were not in dispute, the court found:

> The full-time officers of the Local clearly constitute a select group within the meaning of ERISA. The officers are elected in highly competitive elections, constitute less than one-fifth of one percent of the Local membership, are paid considerably more than the rank and file employees whom the Local represents, and wield considerable power within the Local.

> Considering the full-time officers' position atop the hierarchical structure of the Local, the Supplemental Plan is the type of plan that Congress intended to exempt from ERISA's vesting requirements.

*Id.* at 8–9. Accordingly, the court concluded that Gallione was not entitled to Supplemental Plan benefits under ERISA.

The court also rejected Gallione's claim that he was "entitled to benefits under a unilateral contract theory," *id.* at 9, holding that that claim was preempted by ERISA:

> [T]he Second Circuit has explicitly rejected the use of unilateral contract theory in a context analogous to that of top hat plans. In *Reichelt v. Emhart Corp.,* 921 F.2d 425 (2d Cir.1990), the court held that welfare

benefits plans which, like top hat plans, are exempt from ERISA's stringent vesting requirements, may not be enforced as unilateral contracts. The court emphasized that enforcement of welfare benefit plans under a unilateral contract theory "would nullify Congress's determination in structuring ERISA that welfare benefit plans such as severance plans should be exempted from the stringent vesting requirements applicable to pension benefit plans." *Reichelt*, 921 F.2d at 432. The court's reasoning applies with equal force to top hat plans and the holding in *Reichelt* is clearly dispositive.

District Court Opinion at 10. Judgment was entered in favor of defendants, and this appeal followed.

## II. DISCUSSION

On appeal, Gallione pursues his contentions (1) that the Supplemental Plan was not a top hat plan because it was not limited to a "select" group, and (2) that even if he had no entitlement to a supplemental pension under ERISA, he was entitled to recover on a breach-of-contract theory. We reject his contentions.

### A. *The ERISA Claim*

ERISA, enacted in 1974, is "landmark legislation that subjects a wide variety of employee benefit plans to complex and far-reaching rules designed to protect the integrity of those plans and the expectations of their participants and beneficiaries." *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 929 (3d Cir.1985), *overruled on other grounds, Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir.1993). One of Congress's chief concerns was "to restore credibility and faith in the private pension plans designed for American working men and women." H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 4647 ("House Report"); S.Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4838, 4849; *see also id.* at 4838 (discussing Senate bill's response "to the issue of whether American working men and women shall receive private pension plan benefits which they have been led to believe would be theirs upon retirement"); House Report at 4643 (noting "[c]oncern for loss of benefits by workers after long years of labor through circumstances beyond their control"). ERISA's statement of purposes noted that "many employees with long years of employment are losing anticipated retirement benefits," that employee benefit plans "have become an important factor affecting the stability of employment and the successful development of industrial relations," and that statutory protection is necessary to "assur[e] the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001(a). "Implicit in th[is] congressional statement of purpose is the recognition that the persons to be aided by the statute lacked sufficient economic bargaining power to obtain contractual rights to nonforfeitable benefits." *Darden v. Nationwide Mutual Insurance Co.*, 796 F.2d 701, 706–07 (4th Cir.1986) (discussing scope of the term "employee" under ERISA), *on remand*, 717 F.Supp. 388 (E.D.N.C.1989), *aff'd*, 922 F.2d 203 (4th Cir.1991), *rev'd on other grounds*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992).

As one method of accomplishing the goal of decreasing the number of lost pensions, ERISA established certain minimum requirements that covered plans must meet, including requirements for nonforfeitability, *i.e.*, vesting. However, Congress made ERISA's vesting provisions inapplicable to any plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). *See also id.* § 1081(a)(3) (excepting such plans from ERISA's funding requirements); *id.* § 1101(a)(1) (excepting such plans from ERISA's fiduciary responsibility requirements). Dubbed a "top hat" plan, such a plan was excluded from ERISA's vesting, funding, and fiduciary responsibility requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations. *See, e.g.*, Part II.B. below.

Gallione concedes that the Supplemental Plan was unfunded, but he argues that it was not a top hat plan because the Union employ-

ees it covered did not constitute a "select" group. We disagree. The Union's management was hierarchical. It had 63 officers plus five other employees. Of these 68 persons, only 22 were entitled to participate in the Supplemental Plan. The full-time employees who were not officers were not eligible; nor were any of 41 part-time officers eligible. The 22 who were eligible to participate in the Supplemental Plan were the full-time officers, who had primary responsibility for ongoing operations, for setting Union policy, and for negotiating collective bargaining agreements. Although the officers were elected by, and ultimately required to answer to, the Union's membership, there is no real dispute as to the fact that the full-time Union officers were the upper echelon of Union management. We conclude that the district court did not err in ruling that the Supplemental Plan was a top hat plan and thus was not subject to ERISA's vesting requirements. Accordingly, Gallione's claim under ERISA was properly dismissed.

## B. *The Unilateral–Contract Theory*

The district court rejected Gallione's contention that he was entitled to recover on a breach-of-contract theory because it found, relying on *Reichelt v. Emhart Corp.*, 921 F.2d 425, 431–32 (2d Cir.1990), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991), that contract claims are preempted by ERISA. Though we do not regard the reasoning in *Reichelt*—which dealt with claims for severance pay—as entirely applicable to questions concerning pensions, we conclude that Gallione's contract claim was properly dismissed because he failed to come forward with evidence of any contract entitling him to a supplemental pension.

In *Reichelt*, we observed that ERISA governs two types of employee benefit plans, *i.e.*, those that provide for pension-type benefits and those that provide for welfare-type benefits such as severance pay. We noted that, "[i]n recognition of the expense of maintaining and administering employee benefit plans," 921 F.2d at 429 (citing S.Rep. No. 383, 93rd Cong., 2d Sess. 18, 51, *reprinted in* 1974 U.S.C.C.A.N. 4890, 4904, 4935), "Congress structured ERISA to impose the most stringent requirements in connection with pension plans and left the employer with considerable flexibility with respect to welfare plans." 921 F.2d at 429. Thus, while employee pension plans are subject to elaborate vesting and funding requirements, welfare plans are not, and we concluded that the latter type of plan may be terminated by the employer at any time. *Id.* at 429–30. We rejected the *Reichelt* plaintiffs' contention that they were entitled to severance benefits on a unilateral-contract theory, reasoning that since "ERISA was intended to occupy fully the field of employee benefit plans and to establish that field 'as exclusively a federal concern,'" *id.* at 431 (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)); *see* 29 U.S.C. § 1144(a) (preempting state law regarding matters that "relate to" employee benefit plans), "ERISA preempts civil actions against employers for severance pay predicated on common-law contract principles," 921 F.2d at 431. We concluded that "accepting plaintiffs' argument would nullify Congress's determination in structuring ERISA that welfare benefit plans such as severance plans should be exempted from the stringent vesting requirements applicable to pension benefit plans." *Id.* at 432.

Though Congress also chose to exempt top hat plans from ERISA's vesting and funding requirements, its rationale for so doing differed from its rationale for exempting welfare plans. Whereas employee welfare plans were exempted because of the expense of maintaining and administering such plans, top hat plans were exempted on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions. Thus, DOL has stated that

in providing relief for "top-hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant

thereto, and, therefore, would not need the substantive rights and protections of Title I.

DOL Office of Pension & Welfare Benefit Programs, Opinion 90–14 A, 1990 WL 123933, at *1 (May 8, 1990) ("DOL Opinion"). Thus, although ERISA broadly preempts state law with regard to matters that "relate to" employee benefit plans, 29 U.S.C. § 1144(a), the premise of the exemption of top hat plans, *i.e.*, the executives' ability to negotiate for terms that will suffice to protect their interests, appears to imply that an executive may negotiate contract rights that are enforceable. Accordingly, we are skeptical of the proposition that if such an employee has no viable pension claim under ERISA he necessarily also has no enforceable right to a pension pursuant to a contract.

■ However, we need not definitively explore here the extent to which a pension claim based on contract may be preempted by ERISA, because the record reveals that Gallione's contract claim was properly dismissable for lack of merit.

The essence of Gallione's contract claim is that

> [t]he Supplemental Pension Plan in this case must be viewed as an offer to enter into a Unilateral Contract which Robert Gallione accepted by being an officer with the Union and by his complying with the terms of the plan in effect when he performed in 1971 until 1990 when the employer terminated the plan en futuro.... [H]is rights under the plan are *accrued* in a contractual sense, albeit not "vested" under ERISA's substantive provisions.

(Gallione brief on appeal at 10–11.) This contention finds no support in the record.

The Union, in support of its motion for summary judgment, submitted a Rule 3(g) statement setting out the events concerning the 1977 adoption and 1990 abolition of the Supplemental Plan. The terms of that plan are not in dispute. Gallione did not point to any provision of the Supplemental Plan, nor have we seen one, stating that an officer's rights would accrue or be vested at any time before his retirement. Nor was there a provision stating that the plan could not be eliminated at any time. Indeed, Gallione was one of the incumbent officers who sent the "open letter" to the membership taking credit for having discontinued payments under the Supplemental Plan even before the membership's call for that plan's elimination. Gallione did not dispute that the membership voted, prior to his retirement, to eliminate the Supplemental Plan for any officer who retired subsequent to that vote. Indeed, his own Rule 3(g) statement states that "[t]he plan was terminated by the By–Law passed in April of 1990."

There being no basis on which a reasonable factfinder could find that there was a contractual provision prohibiting the elimination of the Supplemental Plan, and there being no genuine dispute as to the facts that the Supplemental Plan was eliminated in April 1990 for all officers who had not already retired and that Gallione retired thereafter, summary judgment dismissing Gallione's contract claim was proper.

### CONCLUSION

We have considered all of Gallione's contentions on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.