953 F.Supp. 292 (1997)
Charles E. EMMENEGGER, et al., Plaintiffs,
v.
BULL MOOSE TUBE CO., et al., Defendants.
No. 4:96CV1095 CDP.
United States District Court, E.D. Missouri, Eastern Division.
January 27, 1997.
*293 David W. Harlan, Melanie R. King, Gallop and Johnson, St. Louis, MO, for plaintiffs Charles E. Emmenegger, Robert F. Ritzie, James E. Riley.
James R. Dankenbring, Francis E. Pennington, III, Dankenbring and Greiman, St. Louis, MO, for defendants Bull Moose Tube Company, Caparo, Inc., Bull Moose Tube, Ltd. and Swraj Paul.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on defendants' motion to dismiss for lack of subject matter jurisdiction. Plaintiffs allege that this Court has ERISA jurisdiction over six of their counts, and that the remaining count is within the Court's supplemental jurisdiction. Defendants urge that neither the "Phantom Stock Plan" nor the severance policy alleged by the complaint are employee benefit plans covered by ERISA. The Court finds that the "Phantom Stock Plan" is a "top hat" employee pension benefit plan, and that the severance policy is an employee welfare benefit plan, both covered by ERISA. The Court therefore has subject matter jurisdiction over this matter, and will deny the motions to dismiss.
Plaintiffs were senior managers at the defendant corporations, and allege, among other things, that they were terminated in retaliation for their attempt to exercise their rights to receive payments under the defendants' "Phantom Stock Plan." The defendants are their direct employer, two related companies, and one individual associated with the corporate defendants. Although the exact claims vary somewhat, each plaintiff alleges wrongful discharge in retaliation for the exercise of his ERISA rights and that he is entitled to plan benefits under the Phantom Stock Plan. Two of the three plaintiffs also sue for severance pay under a separate severance policy, and for defamation.
For the Court to have jurisdiction under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq., an employee benefit plan must exist. See Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir.1994) (citing Harris v. Arkansas Book Co., 794 F.2d 358, 360 (8th Cir.1986)). ERISA defines employee benefit plans to include either an "employee welfare benefit plan or an employee pension benefit plan or a plan which is both...." 29 U.S.C. § 1002(3); see also Prudential Ins. Co. of America v. Doe, 76 F.3d 206, 207 (8th Cir.1996). Under prevailing law of this circuit, the existence of an ERISA plan is a mixed question of fact and law. Kulinski, 21 F.3d at 256. Plaintiffs here allege that the Phantom Stock Plan is an employee pension benefit plan, of the specific variety known as a "top hat" plan, and that the defendants' severance policy constitutes an employee welfare benefit plan. The Court agrees with plaintiff on both contentions.

A. The Phantom Stock Plan

Defendants characterize the Phantom Stock Plan as a "bonus" program, and argue that because its purpose is not to provide deferred compensation, it is not an ERISA plan. Plaintiffs, on the other hand, argue that the plan is a "top hat" plan whose purpose is to defer compensation, and that it is covered by ERISA.
"Top hat" plans are employee benefit plans within the meaning of ERISA. See Bigda v. *294 Fischbach Corp., 898 F.Supp. 1004, 1016 (S.D.N.Y.1995), aff'd 101 F.3d 108 (2d Cir. 1996). A top hat plan is a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees...." 29 U.S.C. § 1101(a)(1); see also Rockney v. Blohorn, 877 F.2d 637, 639-40 (8th Cir.1989); Duggan v. Hobbs, 99 F.3d 307, 310 (9th Cir.1996). The top hat has been called a "rare subspecies" of ERISA plan, and Congress created a special regime to cover it. See In re New Valley Corp, 89 F.3d 143, 148-49 (3d Cir.1996); see also Gallione v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995). Although top hat plans are exempt from most of ERISA's substantive requirements, they are covered by ERISA's enforcement provisions. New Valley, 89 F.3d at 148-49, Gallione, 70 F.3d at 727; see also Rockney, 877 F.2d at 639-40. The purpose of exempting this type of plan from most ERISA provisions was to allow management and highly compensated employees who participate in unfunded deferred compensation plans to bargain for advantageous plan provisions on their own behalf; Congress recognized that such participants did not need the same level of protection as others. See Kemmerer v. ICI Americas Inc., 70 F.3d 281, 288 (3d Cir.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996); Virta v. DeSantis Enterprises, Inc., 1996 WL 663970, at *3 (N.D.N.Y. Nov. 7, 1996).
On August 30, 1989, the corporate defendants and certain senior managers, including plaintiffs, signed the Phantom Stock Plan. Plaintiffs were the "original participants" in the plan, and they all received phantom shares on the effective date of the plan. Under the terms of the plan, their shares vested on the first, second, and third anniversaries of the original award date because they remained employed with defendants. The plan entitled plaintiffs to deferred incentive compensation payments if the defendant companies achieved certain defined financial goals; section 1.2 of the plan provides that "[t]he Plan allots deferred compensation to each Participant, based upon a multiple of Adjusted Net After Tax Earnings." Under the plan's terms, the corporation defers paying participants for their shares until the termination of their employment without cause, death, retirement, or disability, or until a redemption request made after October 19, 1993.
Section 1.1 of revised plan states that the plan's purpose "is to promote the interests of the Corporations and their stockholders by aligning the interests of senior management of the Corporations with those of the stockholders, encouraging them to be employed by and to remain in the employ of the Corporations, providing them with additional incentives for industry efficiency and compensating them for services rendered to the Corporations."
The parties here agree that the plan is unfunded, and that it was designed for a "select" group of highly compensated employees. See Duggan, 99 F.3d at 310. They disagree, however, on whether the plan defers compensation. ERISA does not define "deferred compensation" for purposes of establishing a top hat plan. Id. The District Court in Duggan found that "[d]eferred compensation generally refers to money which, by prior arrangement, is paid to the employee in tax years subsequent to that in which it is earned, and a deferred compensation plan may do little more than simply delay distribution of cash payments to employees." Duggan v. Hobbs, 1995 WL 150535, at *4 (N.D. Mar. 28, 1995), aff'd 99 F.3d 307 (1996) (citations and quotations omitted); see also Carr v. First Nationwide Bank, 816 F.Supp. 1476, 1488 (N.D.Cal.1993) (ruling that top hat plans need not necessarily provide pension benefits or result in the deferral of income for periods extending to the termination of the covered employment or beyond). Defendants apparently contend that "deferred compensation" under ERISA requires deferral of income beyond the termination of employment, or that the plan must be designed to provide retirement income. The Court does not read ERISA so narrowly, and it believes that deferred compensation has its normal meaning and that deferral need not be until retirement.
Defendants claim that the plan's primary purpose is not to defer compensation/taxation, *295 but to encourage participating employees to stay with the company. However, section 1.1 of the plan provides that the purpose of the plan is to align the interests of senior management with the interests of the stockholders, to encourage the senior management to remain with the corporation, to provide them with an incentive to be industrious and efficient, and to compensate them for "services rendered to the Corporations." Additionally, section 1.2 of states: "The Plan allots deferred compensation to each Participant. ..." The thrust of the plan is therefore to compensate plan participants for their past services to the corporation, and to defer the compensation. See Duggan, 99 F.3d at 311 n. 1. The payments clearly qualify as deferred compensation, and the Court finds that the plan constitutes a top hat plan under § 1101(a)(1). See generally Bass v. Mid-America Co., Inc., 1995 WL 622397, at *5 (N.D.Ill. Oct. 20, 1995).

B. The Severance Pay Program

Defendants argue that the Bull Moose severance program is not an employee welfare benefit plan covered by ERISA. Severance benefits can come within the definition of an employee welfare benefit plan, but "[a]n employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan." Kulinski, 21 F.3d at 256. An ERISA plan will be found only where the employer's provision of benefits requires the creation of a separate ongoing administrative scheme. See Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 12, 107 S.Ct. 2211, 2217-18, 96 L.Ed.2d 1 (1987), cited in Kulinski, 21 F.3d at 256-57. Such a program requires that the administrators "must analyze each employees' particular circumstances in light of the appropriate criteria" in order to determine whether an employee is eligible for any benefits, and, if so, how much he is entitled to. Kulinski, 21 F.3d at 257. Simple or mechanical determinations do not necessarily require the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Id.; see also Wells v. General Motors Corp., 881 F.2d 166, 175-76 (8th Cir.1989) (holding that one-time lump payment to employees terminated in layoff did not qualify as employee benefit plan for purposes of ERISA), cert. denied, 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990). Factors considered by the courts to determine the existence of an "ongoing administrative scheme" include: (1) whether the payments are one-time, lump sum payments or continuous, periodic payments; (2) whether the employer is obligated over a prolonged or a limited time period; (3) whether the severance payments are triggered by a single event, such as a plant closing, or rather are continuous payments to be made generally to terminated employees; and (4) whether the severance "plan" requires the employer to engage in a case-by-case review of employees to determine their particular eligibility based on the applicable criteria. See Gilmore v. Silgan Plastics Corp., 917 F.Supp. 685, 687-88 (E.D.Mo. 1996), and cases cited therein.
Bull Moose's severance policy, which was effective as of April 1, 1984, and was revised on February 18, 1987, states simply:
It is the Company's policy to provide severance pay to employees who are terminated for reasons other than disciplinary and who have given the Company excellent service during their employment at Bull Moose Tube.
This policy is to serve as a guide to determine severance pay and provide consistency in the treatment of those good employees that deserve special attention [sic] at their termination of service.
The policy includes a matrix showing the maximum number of weeks of severance pay to be granted depending on the employee's years of service and pay grade. The Bull Moose employee relations department was responsible for determining a terminated employee's eligibility for severance pay and the amount of severance to be granted.
The severance policy here is an ongoing program which requires defendants to make coverage determinations and pay out benefits on a regular and recurring basis as employees are terminated. As in Pane v. RCA Corp., 667 F.Supp. 168, 170-71 (D.N.J.1987), aff'd 868 F.2d 631 (3d Cir.1989), the "triggering event" that entitles an employee to benefits under the policy is the termination of an *296 employee for reasons other than for cause. Unlike in Delaye v. Agripac, Inc., 39 F.3d 235, 238 (9th Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1402, 131 L.Ed.2d 289 (1995), where the plan only covered one employee, in the instant case the decision whether to make severance payments to terminated employees must be made repeatedly, over a prolonged period of time, and at unforeseeable intervals. The nature and timing of the payouts required by the policy create the need for financial coordination and control. See Bogue v. Ampex Corp., 976 F.2d 1319, 1323 (9th Cir.1992) (holding that the severance plan at issue was an ERISA plan because, "[a]lthough the program ... was triggered by a single event, that event would occur more than once, at a different time for each employee"), cert. denied, 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993); cf. Fort Halifax, 482 U.S. at 12, 107 S.Ct. at 2217-18 (holding that ERISA did not preempt a Maine statute because "[t]he employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control.... To do little more than write a check hardly constitutes the operation of a benefit plan.").
Under the language of the Bull Moose severance policy, coverage extends to employees who: (1) were terminated for reasons other than for cause, and (2) gave the company "excellent service during their employment." The administrator must therefore first decide whether the employee was discharged for cause, which is not a simple mechanical determination. See Simas v. Quaker Fabric Corp., 6 F.3d 849, 853 (1st Cir.1993) (distinguishing Fort Halifax and holding that "`for cause' determination, in particular, is likely to provoke controversy and call for judgments based on information well beyond the employee's date of hiring and termination"). The administrator must also determine whether the employee gave the company "excellent service" while employed. After these two gatekeeping questions have been answered in the affirmative, the policy "is to serve as a guide to determine severance pay and provide consistency in the treatment of those good employees that deserve special [attention] at their termination of service." The policy's matrix merely sets out the "maximum amount of severance pay to be granted," and it therefore vests the administrator with a considerable amount of discretion regarding the determination of an appropriate severance amount. Taking all relevant factors into account, Bull Moose maintained a program to provide employees with "benefits in the event of ... unemployment," and thus had an ERISA plan. See 29 U.S.C. § 1002(1).
Accordingly,
IT IS HEREBY ORDERED that defendants' motion to dismiss [# 7] is denied.