216 F.3d 283 (2nd Cir. 2000)
 PATRICK DEMERY, KEVIN HENNESSY, JOHN MAJKOWSKI, DEBORAH McELROY, RONALD RAMBEAU, ANTHONY SCELZA, KENNETH M. SCHERIFF, THOMAS S. SWAIN, Plaintiffs-Appellants,
v.
EXTEBANK DEFERRED COMPENSATION PLAN (B), BANCO EXTERIOR DE ESPANA, STEPHEN V. MARONEY, NORTH FORK BANK, as a Successor-In-Interest of Extebank, Defendants-Appellees.
 Docket No. 99-7002
August Term 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 10, 1999
Decided: June 15, 2000
 
 Appeal from the order of the United States District Court for the Eastern District of New York (Jacob Mishler, District Judge) dated November 24, 1998, granting defendants-appellees' motion for summary judgment and dismissing the complaint.
 Affirmed.
 BRIAN S. CONNEELY, Jonathan D. Farrell, Meltzer, Lippe, Goldstein, Wolf & Schlissel, Mineola, New York, for Plaintiffs-Appellants.
 LAWRENCE PORTNOY, Davis Polk & Wardwell, New York, New York, for Defendant-Appellee Banco Exterior de Espana.
 JOHN F. CAMBRIA, Jonathan G. Kortmansky, Salans Hertzfeld Heilbronn Christy & Viener, New York, New York, for Defendant-Appellee Stephen V. Maroney.
 ERIC J. BRESSLER, Wickham, Wickham & Bressler, Melville, New York, for Defendants-Appellees Extebank Deferred Compensation Plan (B) and North Fork Bank.
 Before: WALKER and CALABRESI, Circuit Judges, and BERMAN, District Judge.*
 JOHN M. WALKER, JR., Circuit Judge:
 
 
 1
 The sole question in this case is whether a certain deferred compensation plan is a so-called "top hat" plan and thus exempt from most of the substantive requirements generally imposed on deferred compensation plans by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101 et seq.
 
 
 2
 Plaintiffs-appellants Patrick Demery, Kevin Hennessy, John Majkowski, Deborah McElroy, Ronald Rambeau, Anthony Scelza, Kenneth M. Scheriff, and Thomas S. Swain, former bank officers of Extebank and participants in its deferred compensation plan ("plaintiffs") bring this appeal from an order of the United States District Court for the Eastern District of New York (Jacob Mishler, District Judge) dated November 24, 1998, granting summary judgment to defendants-appellees Extebank Deferred Compensation Plan (B), Banco Exterior De Espana, Stephen V. Maroney, and North Fork Bank, as a successor-in-interest of Extebank ("defendants"), and dismissing the complaint. Because we find that the district court was correct as a matter of law that Extebank Deferred Compensation Plan (B) ("Plan B" or "the Plan") qualified as a "top hat" plan exempt from most of the substantive requirements of ERISA, 29 U.S.C. §§ 1101-1145, we affirm.
 
 BACKGROUND
 
 3
 In 1995, Banco Exterior de Espana, a Spanish bank and the corporate parent of Extebank, began negotiating the sale of Extebank to North Fork Bank, a New York bank. The negotiations culminated in a merger between Extebank and North Fork in March 1996, whereby North Fork acquired all the outstanding shares of Extebank and assumed all of its obligations and contractual commitments. The individual defendant, Stephen V. Maroney, was the president of Extebank and resigned following the merger. Plaintiffs were bank officers of Extebank, all of whom served as either vice-president, manager, assistant vice-president or senior vice-president, and participated in its deferred compensation plan, Plan B.
 
 
 4
 Extebank had set up Plan B in 1987, in addition to its regular pension plan. The Plan was offered to assistant vice-presidents, managers, and other senior officers, representing approximately 15% of the workforce of Extebank. Approximately 7 to 10% of Extebank employees actually participated in the Plan, which allowed participants to defer up to 25% of their salary as contributions to the Plan. Participants were also permitted to borrow money at the prime rate from Extebank in order to contribute the maximum allowable amount to the Plan. Participants in the Plan would vest upon reaching retirement age, at which time they were to receive a return on their investment at a compounded annual rate of 20%. If participants left Extebank before they vested, the Plan provided for repayment of the amount invested, plus interest at a compounded annual rate of ten percent. In order to help pay for its obligations under the Plan, Extebank purchased, and was the beneficiary of, life insurance contracts on its employees. The proceeds of these contracts were kept in an account entitled the Deferred Compensation Liability Account.
 
 
 5
 All of the plaintiffs left Extebank shortly before or soon after its merger with North Fork. Most had not reached retirement age and therefore received a lump sum under Plan B that included their contributions to the Plan, plus compounded interest at ten percent, less any pre-retirement payments previously disbursed, including amounts received as loans. Only one of the plaintiffs, Anthony Scelza, was eligible for full retirement benefits, and received his contributions, minus any pre-retirement payments, plus interest at 20% compounded annually.
 
 
 6
 Plaintiffs filed a complaint in December 1997, claiming benefits under ERISA and various common law claims. Defendants moved to dismiss the complaint on the basis that Plan B was a top hat plan exempt from the substantive requirements of ERISA. The district court converted the motion to dismiss into a motion for summary judgment, and plaintiffs cross-moved for partial summary judgment on the basis that Plan B was not a top hat plan as a matter of law. On November 23, 1998, the district court held that Plan B was a top hat plan and thus exempt from the substantive requirements of ERISA. The court further found that plaintiffs' common law claims were preempted by ERISA, and dismissed the complaint in its entirety. This appeal followed.
 
 DISCUSSION
 
 7
 Plaintiffs appeal from the district court's grant of summary judgment against them, arguing that (1) summary judgment was granted before the parties engaged in discovery; (2) Plan B was not a top hat plan because (a) participation in Plan B was offered to over 15% of Extebank employees, (b) participation in Plan B was offered to employees earning around $30,000 a year, (c) the district court failed to make findings that the Plan's participants could effectively negotiate for themselves, and (d) the Plan was funded; (3) defendants violated ERISA's disclosure and notice requirements; and (4) the district court improperly dismissed their claims of breach of fiduciary duty. We consider each argument in turn.
 
 I. Standard of Review
 
 8
 We review a district court's grant of summary judgment de novo. See American Fed'n of Grain Millers, AFL-CIO v. International Multifoods Corp., 116 F.3d 976, 978-79 (2d Cir. 1997). Although we consider the evidence in the light most favorable to the non-moving party, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "the mere existence of factual issues - where those issues are not material to the claims before the court - will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).
 
 II. The Grant of Summary Judgment
 
 9
 Plaintiffs argue first that the district court erred by granting summary judgment to defendants before any discovery by either party. Before us they contend that "the relevant and material facts are sharply disputed;" yet before the district court, plaintiffs maintained that "they are entitled to summary judgment on the issue of whether Plan B is a 'Top Hat' plan based solely on the facts concerning participation in the Plan in the affidavits submitted by the Plaintiffs, exhibits annexed thereto, and applicable federal regulations, Department of Labor Opinion letters, and published and unpublished case law." Plaintiffs have offered no explanation for their change of position. Furthermore, plaintiffs never noticed any depositions or requested the production of any documents until May 29, 1998, three days after the district court asked the parties to submit proofs. On that day, plaintiffs noticed the deposition of Gayle Lauben, a former Extebank employee and a participant in Plan B. Apart from this single request, plaintiffs served no other discovery requests on any of the defendants, and did not seek an order compelling discovery. Their Rule 56(f) affirmation did not delineate what, if any, additional discovery they needed or wanted to pursue, and how such discovery could raise an issue of material fact. Given their own representations to the district court and their anemic pursuit of discovery, the district court did not abuse its discretion by granting summary judgment without allowing further discovery.
 
 
 10
 III. The Requirements of a Top Hat Plan under ERISA
 
 
 11
 ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state that ERISA shall apply to any employee benefit plan, other than listed exceptions. One of these exceptions, known as a top hat plan, is defined as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-1145. In this case, we must determine whether Plan B was (1) unfunded, and (2) maintained primarily for a select group of management or highly compensated employees. Plaintiffs maintain that Plan B was neither. We disagree.
 
 A. Whether the Plan was Funded
 
 12
 Plaintiffs argue that the Plan was funded within the meaning of ERISA because (a) it was funded through the purchase of life insurance contracts on the participants, (b) the proceeds were kept in a separate bank account, the Deferred Compensation Liability Account, and (c) Extebank's documents stated that "the Bank has funded this liability through the purchases of insurance coverage." We find no merit to plaintiffs' arguments.
 
 
 13
 We have previously noted that a plan was unfunded where "benefits thereunder will be paid . . . solely from the general assets of the employer." Gallione v. Flaherty, 70 F.3d 724, 725 (2d Cir. 1995). In Miller v. Heller, 915 F. Supp. 651 (S.D.N.Y. 1996), the court held that the question a court must ask in determining whether a plan is unfunded is: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?" Id. at 660. We approve of the formulation suggested in Miller, and therefore turn to the provisions of the Plan itself.
 
 Here, by the Plan's express terms:
 
 14
 [T]he Employer's obligation to make payments to any person under this Agreement is contractual and . . . the parties do not intend that the amounts payable hereunder be held by the Employer in trust or as a segregated fund for the Employee . . . . The benefits provided under this Agreement shall be payable solely from the general assets of the Employer, and neither the Employee, the Beneficiary, nor any other person entitled to payments . . . shall have any interest in any specific assets of the Employer by virtue of this Agreement. Employer's obligation under the Plan shall be that of an unfunded and unsecured promise of Employer to pay money in the future.
 
 
 15
 Plan B, Paragraph 13. The terms of the Plan plainly do not give plaintiffs a greater legal right to the funds in the Deferred Compensation Liability Account than that possessed by an unsecured creditor. The district court correctly found that the revenues from the insurance policies purchased on the participating employees, although deposited in a separate account, "became part of the general assets of Extebank," and thus that the Plan was unfunded as a matter of law.
 
 
 16
 B. Whether Plan B Was Maintained Primarily for a Select Group
 
 
 17
 Viewing the Plan as a whole, we conclude that it qualifies for top hat status. As a preliminary matter, we note that Plan B was supplemental to Extebank's regular pension plan, and not a substitute for it. In addition, the Plan was established "as a means to retain valuable employees," and the terms of the Plan were quite favorable to the participants, although perhaps in hindsight not as favorable as they would have liked. These factors must weigh in favor of classifying the Plan as a top hat plan. In terms of being established for a "select group," although the Plan was offered to a relatively large percentage of the workforce, all participants were selected officers of the bank, were in management positions, and were highly compensated in comparison to bank employees at large. We therefore hold that Plan B was a top hat plan as a matter of law.
 
 
 18
 Plaintiffs urge that the "select group" requirement for a top hat plan was not met because (a) participation in Plan B was offered to 15.34% of Extebank employees, (b) the participants were not all either management or highly compensated, and (c) the participants did not have the ability effectively to negotiate for themselves. To determine whether the participants of an employee benefit plan are "a select group of management or highly compensated employees," 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1), we require the district court to conduct a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction. See, e.g., Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir. 1996) (holding that the "select group" requirement includes "more than a mere statistical analysis"); Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 148 (3d Cir. 1996) (considering "both quantitative and qualitative restrictions").
 
 
 19
 While plans offered to a very small percentage of an employer's workforce often qualify as top hat plans, see, e.g., Gallione, 70 F.3d at 726 (0.2% of total Union membership, although this figure represented 22 of 68 Union managers); Duggan, 99 F.3d at 312 (a single employee); Belka v. Rowe Furniture Corp., 571 F. Supp. 1249, 1252 (D. Md. 1983) (4.6% of workforce), there is no existing authority that establishes when a plan is too large to be deemed "select." Plaintiffs argue that no case has ever held that a plan offered to 15% of an employer's workforce was a top hat plan. Plaintiffs cite one case and one Department of Labor letter in support of their argument. In Darden v. Nationwide Mutual Insurance Co., 717 F. Supp. 388, 397 (E.D.N.C. 1989), aff'd, 922 F.2d 503 (4th Cir. 1991), rev'd on other grounds, 503 U.S. 318 (1992), the court found that 18.7% of the workforce was too large a percentage for a benefit plan to qualify as a top hat plan. While the court found that the average income of participating employees was comparable to that of other employees in the company at large, it considered the size of the plan separately, finding that "the group in question here, comprising almost one-fifth of the total Nationwide workforce, is too large to be considered 'select' for purposes of the top-hat exemption." Id. On the other hand, the Department of Labor, in DOL Opinion Letter 85-37A, found that a deferred compensation plan offered to 7.5% of employees was not a top hat plan because of the composition of the group, rather than its size. After noting that the plan had been offered to foremen, an assistant in the cost department, an order department clerk, and an expediter, among others, and that the salaries of the participants ranged between $12,121 and $55,000, the DOL administrator stated that "in view of the broad range of salaries and positions of the employees represented to be covered under the Plan, the Plan is not a plan maintained 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" DOL Opinion Letter 85-37A, 1985 ERISA LEXIS 7, at *5-6 (Oct. 25, 1985).
 
 
 20
 The circumstances here are different from those in Darden or the DOL Letter. The district court determined that Plan B was offered only to bank officers, most of whom were employed in managerial positions, and found that Plan B participants' average compensation was more than twice the average compensation of Extebank employees. The court also noted that plaintiffs described themselves in their complaint as a select group ("plaintiffs are former bank officers of Extebank . . . invited . . . to participate in one of Extebank's deferred compensation plans . . . as a reward for their years of service to the bank"), and that minutes of the Extebank board reflected the fact that the Plan at its inception was "viewed as a means to retain valuable employees."
 
 
 21
 Plaintiffs argue that because Plan B was offered to 15.34% of Extebank employees, the plan was offered to more than a select group. While this number is probably at or near the upper limit of the acceptable size for a "select group," we cannot say that it alone made Plan B too broad to be a top hat plan without considering the positions held at the bank by the Plan's participants. It is clear from our prior decision in Gallionethat a "select group of management" could include senior management and high-level executives. See Gallione, 70 F.3d at 728 (all full-time Union officers constituted a select group); see also Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp., 848 F. Supp. 1515, 1520 (N.D. Ala. 1994) ("certain key officers" and "certain executives").
 
 
 22
 Plaintiffs also claim that despite the fact that all Plan B participants were officers of Extebank, they did not constitute a select group because they were neither key executives nor highly compensated. We do not find this argument compelling. While Plan B participants did include assistant vice presidents and branch managers, and therefore swept more broadly than a narrow range of top executives, it was nonetheless limited to highly valued managerial employees. Moreover, unlike other situations in which plans were found not to satisfy the "select group" requirement, participation in Plan B was not offered to employees at widely varying levels. Cf. DOL Opinion Letter 85-37A, 1985 ERISA LEXIS 7, at *5-6 (plan offered to several foremen, an assistant in the cost department, an order department clerk, and an expediter, among others, was not a top hat plan). Furthermore, the average salary of plan participants was more than double that of the average salary of all Extebank employees. We find this did make them "highly compensated" within the meaning of 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1).
 
 
 23
 Finally, we think it significant that the statute defines a top hat plan as "primarily" designed to provide deferred compensation for certain individuals who are management or highly compensated. Id. It suggests that if a plan were principally intended for management and highly compensated employees, it would not be disqualified from top hat status simply because a very small number of the participants did not meet that criteria, or met one of the criteria but not the other. See, e.g., Belka, 571 F. Supp. at 1252 (participants in valid top hat plan included "salesmen and a diverse group of executives, including vice presidents, sales managers, [and] supervisors"). Therefore we do not find plaintiffs' focus on the two or three employees who were arguably not "highly compensated" or "a select group of management" to be dispositive.
 
 
 24
 Plaintiffs also claim that the participants in Plan B did not have the ability to negotiate the terms of the Plan. Ability to negotiate is an important component of top hat plans; we have noted that top hat plans have been exempted from ERISA's substantive requirements "because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." Gallione, 70 F.3d at 727. Congress approved of a lesser level of regulation for top hat plans "on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions." Id. at 728; see also Kemmerer v. ICI Americas Inc., 70 F.3d 281, 286 (3d Cir. 1995) ("Top hat plans . . . which benefit only highly compensated executives, and largely exist as devices to defer taxes, do not require such scrutiny and are exempted from much of ERISA's regulatory scheme.").
 
 
 25
 Here, the record is silent as to plaintiffs' ability to negotiate the terms of the Plan, and there is no evidence that they attempted to do so. Plaintiffs argue only that the differences between Plan B and Plan A, the heavily negotiated supplemental compensation package that Extebank offered to four of its highest ranking officers, prove that the participants in Plan B had no appreciable bargaining power. While the differences between the plans are not inconsequential - at least some of the Plan B participants did not need to defer taxes, since they borrowed money to pay their contributions, and participation in Plan B was wider and targeted at middle management rather than at the very top executives - they shed little light on plaintiffs' bargaining power. We do not think plaintiffs have proffered either direct or circumstantial evidence suggesting an absence of bargaining power sufficient to raise a question of fact on this issue.
 
 IV. Reporting and Disclosure Violations
 
 26
 Plaintiffs claim that defendants failed to file registration statements for Plan B with the Department of Labor and the Internal Revenue Service for ten years, and refused to honor their requests for Plan documents, in violation of 29 U.S.C. § 1024(b) (requiring publication of summary plan description and annual report to participants and beneficiaries of plan). But a top hat plan is deemed to have satisfied the reporting and disclosure requirements of ERISA, including the furnishing of a summary plan description and annual reports to plan beneficiaries, by filing a short statement with the Secretary of Labor and providing plan documents to the Secretary upon request. See 29 C.F.R. § 2520.104-23(b) (prescribing alternative method of compliance); see also 29 U.S.C. § 1030 (authorizing Secretary to promulgate alternative methods of compliance for qualifying plans). Defendants filed a registration statement with the Department of Labor and with the Internal Revenue Service, and thereby satisfied the reporting and disclosure requirements of ERISA. While we note that this statement was not filed "within 120 days after the plan becomes subject to Part 1," 29 C.F.R. § 2520.104-23(b)(2), since it was not filed until several years after the Plan was initiated, plaintiffs do not allege any harm from this deficiency. In the absence of prejudice to plaintiffs, we find no abuse of discretion in the district court's decision not to impose the penalties permitted by 29 U.S.C. § 1132(c) (allowing the district court in its discretion to find plan administrator personally liable for failure to supply requested information).
 
 
 27
 V. Fiduciary Duty and Breach of Contract Claims
 
 
 28
 Plaintiffs also complain that the district court improperly dismissed their claims for breach of fiduciary duty and breach of contract on the basis that they were preempted by ERISA. Plaintiffs claim that the defendants breached their fiduciary duty to the plaintiffs by "threatening to terminate participants and Plan (B) when Defendants knew it would be illegal to do so," concealing the existence of Plan A, and "utiliz[ing] the life insurance policies purchased to fund Plan (B) and substantial proceeds of those policies for their own benefit." As before, plaintiffs proffer no direct or circumstantial evidence sufficient to raise a genuine question of material fact with regard to these issues. Upon termination of the Plan, plaintiffs received repayment of the amount invested, plus interest at a compounded annual rate of 10%. The fact that the sums of money were lesser than anticipated, due to taxes or repayment of amounts borrowed, is of no moment. Plaintiffs obtained what they bargained for under the contract. Regardless of whether these state claims were preempted by ERISA, they were without merit and were properly dismissed. In addition, as the fiduciary responsibility provisions of ERISA do not apply to top hat plans, see 29 U.S.C. § 1101(a)(1), to the extent that plaintiffs' claim for breach of fiduciary duty was based upon ERISA, the district court correctly dismissed it.
 
 
 29
 We have reviewed all of plaintiffs' additional claims and find them to be without merit.
 
 CONCLUSION
 
 30
 We conclude that Plan B, a deferred compensation plan maintained primarily for a select group of management or highly compensated employees, is a top hat plan as a matter of law. We further find that the district court properly granted summary judgment to defendants and dismissed the complaint. The district court's order is affirmed.
 
 
 
 Note:
 
 
 *
 The Honorable Richard M. Berman of the United States District Court for the Southern District of New York, sitting by designation.