# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41887

JEFFREY EDWARD HUBER, an individual )
)
  Plaintiff-Appellant, )
)
v. )
)
LIGHTFORCE USA, INCORPORATED, a )
Washington corporation, doing business as )
NIGHTFORCE OPTICS, )
)
  Defendant-Respondent. )
_____ )

Boise, November 2015 Term

2015 Opinion No. 112

Filed: December 15, 2015

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Second Judicial District of the State of Idaho, Clearwater County. Hon. Michael J. Griffin, District Judge.

The judgment of the district court is affirmed in part and reversed in part and the case is remanded.

McConnell Wagner Sykes & Stacey PLLC, Boise, for appellant. Jeffrey R. Sykes argued.

Moffatt, Thomas, Barrett, Rock & Fields, Chtd, Boise, for respondent. Andrea J. Rosholt argued.

_____

J. JONES, Chief Justice

Jeff Huber brought this action against his former employer, Lightforce USA, Inc. ("LFUSA"), for breach of contract and failure to pay wages. Huber's claims center on two agreements entered into during his employment with LFUSA: a Company Share Offer ("CSO"), and a Deed of Non-Disclosure, Non-Competition and Assignment ("NDA"). Huber claimed that upon his termination LFUSA was obligated to pay him the value of 30% of the goodwill of LFUSA under the CSO and twelve months' pay under the NDA. The parties agreed that the CSO was a deferred compensation plan and was, therefore, governed by the Employee Retirement Income Security Act ("ERISA"). At a bench trial, Huber succeeded only on his breach of contract claim under the NDA. Huber timely appealed the district court's rulings on summary judgment: (1) holding that the amount owed under the NDA was not wages under the Idaho

1

Wage Claims Act, (2) dismissing his wrongful termination claim, and (3) holding that the CSO was a "top hat" plan under ERISA and, therefore, exempt from ERISA's vesting and anti-forfeiture provisions. Huber also appealed the district court's ruling at trial that Huber forfeited the benefit under the CSO, and the district court's rulings on post-trial motions: (1) denying his claim for equitable relief, (2) calculating Huber's award of prejudgment interest, and (3) awarding attorney fees and costs to LFUSA. Both Huber and LFUSA request attorney fees on appeal.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Lightforce Australia ("LFA") is an Australian company owned by Ray Dennis which manufactures spotlights for night hunting. In the early 1990s, Dennis expanded LFA into the United States and formed LFUSA, a Washington corporation. Jeff Huber began working for LFUSA in 1991 and was promoted to vice president in 1997. Huber was the person primarily responsible for LFUSA's daily operations and management as Dennis and the LFA Board of Advisors were located in Australia.[1]

In 2000, LFUSA relocated from Washington to Orofino, Idaho. At that time, Huber and LFUSA entered into the CSO. The CSO provided that, beginning in 2000, Huber would receive 30% of the goodwill of LFUSA at a rate of 5% per year in exchange for his long-term employment and loyalty. As part of the CSO, LFUSA agreed to take out a $1,000,000 insurance policy on Huber to pay the value of the goodwill upon his illness, incapacitation, or death. Additionally, the CSO provided that Huber could exchange the goodwill for shares in the company if he retired at a reasonable age. However, any goodwill would be forfeited if Huber left LFUSA voluntarily or was terminated due to "unsatisfactory performance." Huber was the only LFUSA employee ever offered the opportunity to participate in a CSO. In 2003, Huber, on behalf of LFUSA, purchased a $1,000,000 term life insurance policy on himself. The policy designated LFUSA as the owner and fifty-percent beneficiary and Huber's parents collectively as a fifty-percent beneficiary. In 2006, Huber amended the policy, reducing its value to $750,000. Huber then converted the remaining $250,000 into a whole life policy and designated himself and LFUSA as the owners of the policy and LFUSA and his wife each as fifty-percent beneficiaries.

---

[1] LFUSA is a subsidiary of LFA and is governed by the LFA Board of Advisors.

By 2010, LFUSA had grown significantly, but Huber's relationship with the company had begun deteriorating. In March 2010, Monika Leniger-Sherratt, LFA's group general manager, conducted a workforce planning review of LFUSA. After interviewing key individuals, Leniger-Sherratt concluded that LFUSA lacked communication and formal meeting procedures within management and there was confusion about Huber's direction for the company. Additionally, Huber was known to micromanage staff without consulting department heads. After the review, Huber met with the LFA board, which recommended that he hire a second-in-command to aid in his vice-president responsibilities. Huber did not follow that recommendation.

In July 2010, LFUSA's financial officer, Hope Coleman, reported to Leniger-Sherratt that Huber had instructed her to falsify a backorder report that was to be presented at a LFA board meeting. At the meeting, Huber reported that the backorders for 2010 totaled $1.1 million. However, Coleman had given Leniger-Sherratt a report showing that the backorders for 2010 were actually around $2.4 million. In August, Huber again met with the LFA board. The board questioned Huber about the backorder report and he denied knowing that the backorders totaled $2.4 million for 2010. After the meeting, the LFA board restructured LFUSA's management, replacing Huber's role as vice president with a managing board referred to as the Organization Managing Group ("OMG"). At that time, Huber was made Director of Research & Development and he retained a position on the OMG. Despite the management change, the LFA board received complaints that Huber continued to act as though he was vice president and make major business decisions without consulting the OMG. Additionally, the board received complaints that Huber was hostile toward staff.

In February 2011, LFUSA requested that Huber sign the NDA. In the NDA, Huber agreed not to compete with LFUSA during his employment and for twelve months after employment. Huber also agreed not to disclose confidential information and to assign his rights in any intellectual property to LFUSA. The NDA also provided that if Huber was terminated he would receive twelve months' pay as long as he was not terminated for performance related issues or summarily dismissed. [2]

---

[2] Section 3.2.3 of the NDA defined performance related issues as "substandard performance which is properly managed through a performance management program, including a formal warning process." Summary dismissal was defined as "immediate termination of employment, for acts of willful misconduct, serious breaches of adherence to policy and procedures, theft, fraudulent behavior and/or any unlawful behavior."

In May 2011, due to continued complaints from LFUSA employees, the LFA board removed Huber from the OMG, but allowed him to retain his position as Director of Research & Development. Huber was also encouraged to take a two-month vacation. While Huber was on leave, several LFUSA employees expressed concern about Huber returning to LFUSA and threatened to leave the company. On August 1, 2011, Dennis and Leniger-Sherratt informed Huber that he would be terminated effective August 1, 2012. Leniger-Sherratt, in a letter dated August 3, 2011, memorialized this conversation and documented performance issues which formed the basis for Huber's termination, including: not being transparent with the LFA board, being hostile toward LFUSA staff, and directing the financial officer to falsify the backorder report in 2010. Dennis and Huber agreed that from August 2011 to August 2012, Huber would receive his full salary and benefits, but Huber would not return to work at LFUSA. Instead, Huber was to explore future business opportunities for him and Dennis outside of LFUSA. Huber's termination became effective one year later on August 1, 2012, and Huber sought to collect the goodwill benefit under the CSO and twelve months' pay under the NDA. LFUSA refused to pay Huber.

On August 27, 2012, Huber filed suit against LFUSA for breach of contract and unpaid wages under the Idaho Wage Claims Act ("IWCA"). Huber amended his complaint on May 29, 2013, to add claims for wrongful termination and breach of the implied covenant of good faith and fair dealing. Additionally, Huber added a claim under ERISA, 29 U.S.C. § 1001 *et seq.*, alleging that the CSO was a deferred compensation plan under ERISA and LFUSA was in violation of ERISA for interfering with his rights therein. The parties agreed to proceed with a bench trial.

Prior to trial, both Huber and LFUSA moved for partial summary judgment. In July 2013, Huber asked the district court to summarily rule that: (1) the CSO was a pension plan subject to ERISA and, therefore, his rights had vested and were not subject to forfeiture; and (2) the amount owed under the NDA was wages under the IWCA and, therefore, subject to trebling under Idaho Code section 45-615. Prior to a ruling on Huber's motion, the parties stipulated that the CSO was a deferred compensation plan under ERISA. However, LFUSA argued that the CSO was a "top hat" plan and, therefore, exempt from ERISA's vesting and anti-forfeiture provisions. The district court ruled that there was a genuine issue of material fact as to whether the CSO was a top hat plan and subject to the anti-forfeiture provisions of ERISA, but held that

4

the amount owed under the NDA was not wages and, therefore, not subject to trebling under Idaho Code section 45-615.

In August 2013, LFUSA asked the district court to summarily rule that the CSO was a top hat plan under ERISA and to dismiss Huber's claim for wrongful termination of employment. The district court held that the CSO was a top hat plan and, therefore, was exempt from ERISA's vesting and anti-forfeiture provisions. The district court found that whether Huber would recover under the CSO depended on whether Huber had forfeited the benefit by being terminated for "unsatisfactory performance." Additionally, the district court dismissed Huber's claim for wrongful termination.

Trial was held from October 21 through October 30, 2013. As the issues had been significantly limited by the district court's rulings on summary judgment, the trial focused primarily on two issues: (1) whether Huber was terminated for unsatisfactory performance and, therefore, forfeited the goodwill benefit under the CSO and (2) whether Huber was terminated for performance issues or summarily dismissed and, therefore, was not owed any compensation under the NDA. The district court concluded that Huber was owed $180,000 (twelve months' pay) under the NDA because he was neither terminated for performance related issues nor summarily dismissed as defined in the NDA. However, the district court found that Huber forfeited the benefit under the CSO because he had been terminated for unsatisfactory performance, relying on the reasons documented in the August 3, 2011 letter from Leniger-Sherratt.

During closing arguments, Huber argued that the court should grant him an equitable share of the goodwill even if he was not entitled to the full 30%. The court denied relief, stating that Huber had not pled equitable relief and, even if he had, Huber had received sufficient compensation for his past work. Huber later moved to amend his pleadings to incorporate the claim for equitable relief, which the district court also denied.

After trial, both parties moved for an award of attorney fees and costs and Huber moved for an award of prejudgment interest. The district court awarded Huber prejudgment interest from August 2013 to December 2013, totaling $7,752.58. The court found that the amount owed under the NDA was not due and owing until twelve months after Huber was terminated because it was conditioned on Huber complying with the twelve-month, non-competition period in the NDA. Both parties had moved for an award of attorney fees under Idaho Code section 12-120(3)

5

and ERISA. The district court declined to award either party attorney fees under ERISA. However, the district court held that LFUSA was the prevailing party and awarded LFUSA $264,000.00 in fees under Idaho Code section 12-120(3). The district court found that, although Huber prevailed on the NDA claim, LFUSA prevailed on the larger issues of whether the CSO was a top hat plan and whether Huber's rights under the CSO were forfeited because he was terminated for unsatisfactory performance. Additionally, the district court awarded LFUSA $15,584.51 in costs as a matter of right and $4,880.25 in discretionary costs. Huber filed a motion for reconsideration of the district court's decision to award attorney fees and costs to LFUSA, which was denied. Huber timely appealed.

## II.
## ISSUES ON APPEAL

1. Whether the district court erred in ruling that the amount owed to Huber under the NDA was not wages under the Idaho Wage Claims Act.

2. Whether the district court abused its discretion by denying Huber prejudgment interest prior to August 2013.

3. Whether the district court erred in ruling that the CSO was a "top hat" plan under ERISA.

4. Whether the district court erred in ruling at trial that the CSO's forfeiture clause was enforceable and that Huber forfeited all his benefits thereunder.

5. Whether the district court abused its discretion by dismissing Huber's equity claim and denying Huber's motion to amend his complaint to include the equity claim.

6. Whether the district court abused its discretion in awarding LFUSA, not Huber, attorney fees and costs.

7. Whether either Huber or LFUSA are entitled to attorney fees on appeal.[3]

## III.
## STANDARD OF REVIEW

Huber appeals several of the lower court's decisions on summary judgment.

> Appeals from an order of summary judgment are reviewed de novo, and this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if

---

[3] Huber also raised the issue of whether the district court erred in dismissing his wrongful termination claim. However, this Court "will not consider an issue not 'supported by argument and authority in the opening brief.'" *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (quoting *Jorgensen v. Coppedge*, 145 Idaho 524, 528, 181 P.3d 450, 454 (2008)). Although Huber specifically listed the dismissal of his wrongful termination claim as an issue on appeal, he did not provide any form of argument or authority to support it. "Regardless of whether an issue is explicitly set forth in the party's brief as one of the issues on appeal if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court." *Id*. Therefore, we will not address this issue.

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. I.R.C.P. 56(c). Under this standard, disputed facts are construed in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are drawn in favor of the non-moving party. Where the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review.

*Trotter v. Bank of N.Y. Mellon*, 152 Idaho 842, 845–46, 275 P.3d 857, 860–61 (2012) (footnotes, internal case citations, and internal quotation marks omitted).

Additionally, Huber appeals the district court's determination at trial that Huber forfeited the goodwill benefit under the CSO.

When reviewing a trial court's conclusions following a bench trial, our review is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings support the conclusions of law. Since it is the province of the trial court to weigh conflicting evidence and testimony and to judge the credibility of witnesses, this Court will liberally construe the trial court's findings of fact in favor of the judgment entered. These findings of fact will not be set aside unless the trial court's findings are clearly erroneous. If the trial court based its findings on substantial evidence, even if the evidence is conflicting, this Court will not overturn those findings on appeal. Furthermore, this Court will not substitute its view of the facts for that of the trial court. However, we exercise free review over matters of law.

*Vreeken v. Lockwood Eng'g, B.V.*, 148 Idaho 89, 108, 218 P.3d 1150, 1169 (2009) (internal citations and quotation marks omitted).

The other issues on appeal are reviewed for abuse of discretion. *Oakes v. Boise Heart Clinic Physicians, PLLC*, 152 Idaho 540, 542–43, 272 P.3d 512, 514–15 (2012) (the determination of who is a prevailing party is reviewed for abuse of discretion); *Climax, LLC v. Snake River Oncology of E. Idaho, PLLC*, 149 Idaho 791, 794, 241 P.3d 964, 967 (2010) (rulings on equitable remedies are reviewed for abuse of discretion); *Farmers Ins. Exch. v. Tucker*, 142 Idaho 191, 193, 125 P.3d 1067, 1069 (2005) (denial of a motion to amend a complaint is reviewed for abuse of discretion); *Dillon v. Montgomery*, 138 Idaho 614, 617, 67 P.3d 93, 96 (2003) (an award of prejudgment interest is reviewed for abuse of discretion).

When examining whether a district court abused its discretion, this Court considers whether the district court: (1) perceived the issue as one of discretion; (2) acted within the outer boundaries of that discretion and consistently within the applicable legal standards; and (3) reached its decision by an exercise of reason.

*Oakes*, 152 Idaho at 543, 272 P.3d at 515.

IV.
ANALYSIS

**1. The district court erred in ruling that the amount owed under the NDA was not wages under the Idaho Wage Claims Act.**

At trial, the district court ruled that LFUSA owed Huber twelve months' pay under the terms of the NDA, totaling $180,000. That ruling is not on appeal. However, Huber contends that the district court erred in ruling on summary judgment that the twelve months' pay was not wages under the IWCA [I.C. §§ 45-601 *et seq*]. On summary judgment, the district court concluded that the twelve months' pay was not wages because it was meant to compensate Huber for complying with the NDA's non-competition and non-disclosure clauses and not earned in increments as services were performed or in consideration for services rendered. On appeal, Huber contends that the pay was not expressly conditioned on Huber complying with the non-competition clause. Huber also argues that the twelve months' pay is analogous to severance pay which constitutes wages under the IWCA and, therefore, the $180,000 judgment should be trebled under Idaho Code section 45-615. *Id.*

The disposition of this issue requires this Court to interpret the definition of "wages" under the IWCA.

> The interpretation of a statute is a question of law over which we exercise free review. This Court must construe a statute to give effect to the intent of the legislature. It must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole.

*Paolini v. Albertson's Inc*., 143 Idaho 547, 549, 149 P.3d 822, 824 (2006) (internal citations and quotation marks omitted).

Wage claims are governed by Chapter 6 of Title 45 of the Idaho Code. "Wage" is defined broadly under Idaho Code section 45-601(7) as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece or commission basis." In *Paolini*, this Court found that the statute "is not limited to wages earned during a calendar month or to wages normally paid every calendar month" but also applies to "[w]ages earned over a longer period of time, such as an annual bonus based on net profits [which] will become due during a specific calendar month." 143 Idaho at 549, 149 P.3d at 824. In determining whether a particular item constitutes "wages," this Court has considered whether the item is bargained-for

compensation for employment services. *Johnson v. Allied Stores Corp.*, 106 Idaho 363, 367, 679 P.2d 640, 644 (1984).

In *Johnson*, this Court held that severance pay is wages because it is "a component of the compensation bargained for in the agreement of employment . . . not a mere gratuity." *Id*. "'Severance pay' has been defined as '[a] sum of money usually based on length of employment for which an employee is eligible upon termination.'" *Parker v. Underwriters Lab., Inc.*, 140 Idaho 517, 520, 96 P.3d 618, 621 (2004) (quoting American Heritage Dictionary of the English Language (4th ed. 2000)). "The purpose of a severance plan is to protect employees from economic hardship and to reward them for *past service* to the company." *Id.* (quoting 27 Am. Jur. 2d *Emp't Relationship* § 70 (1996)) (emphasis added). Although in *Parker* this Court was defining "severance pay" under an administrative provision unrelated to the IWCA, the Court's reasoning is nevertheless instructive on this issue.

Under *Parker*, severance pay is a distinct form of compensation in that it is intended to compensate an employee for past service and protect an employee from economic hardship. This is consistent with *Johnson*, where this court held that severance pay was wages because it is part of the bargained-for compensation for employment services. *See Johnson*, 106 Idaho at 367, 679 P.2d at 644. In *Parker*, this Court distinguished between severance pay and pay in consideration of a release of claims, focusing on the terms of the agreement. 140 Idaho at 521, 96 P.3d at 622. We held that a payment made in exchange for a release of claims against an employer was not severance because it was entirely separate from services rendered during employment. *Id.* at 522, 96 P.3d at 623. Similarly, in *Moore v. Omnicare*, this Court held that compensation promised in an employment agreement is not wages where it is not in consideration for any services actually rendered during employment. 141 Idaho 809, 819–20, 118 P.3d 141, 151–52 (2005) (holding that damages under a liquidation clause were not wages because they were not compensation for services rendered).

Huber argues that the amount owed under the NDA is analogous to severance pay and that this court's holding in *Johnson*, 106 Idaho 363, 679 P.2d 640, should control. Relying on *Moore*, 141 Idaho 809, 118 P.2d 141, LFUSA argues that the twelve months' pay cannot be considered severance because it was consideration for compliance with the NDA's non-competition clause, not for any services rendered during employment. To resolve this issue, we must examine the terms of the NDA and determine whether the twelve months' pay was

intended to compensate Huber for his past service as an employee, or if it was in consideration of Huber's compliance with the non-competition and non-disclosure clauses.

> When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law. An unambiguous contract will be given its plain meaning. The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. In determining the intent of the parties, this Court must view the contract as a whole. If a contract is found ambiguous, its interpretation is a question of fact. Whether a contract is ambiguous is a question of law.

*Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 361, 93 P.3d 685, 692 (2004) (internal citations and quotation marks omitted).

Section 3 of the NDA, titled "NON COMPETITION," includes the clause providing for the twelve months' pay as well as several non-competition conditions. Section 3.1 provides that unless LFUSA provides written consent, Huber must not, during employment or for twelve months after, compete with LFUSA in the specific ways described in subsections 3.1.1 through 3.1.4.[4] Section 3.2 provides that

> In the event that the employee is terminated for any reason other than performance related issues (as defined) and/or summary dismissal (as defined), the employer will pay the employee an amount congruent with the base salary at the time of termination for the period as stipulated in 3.1 in accordance with the provisions outlined in 3.2.1 and 3.2.2.

Subsections 3.2.1 and 3.2.2 provide that if Huber were to obtain employment in the twelve months after being terminated, LFUSA would continue to pay him the difference between the compensation earned in his new employment and his base salary at the time of his termination. However, LFUSA would stop payments if Huber obtained employment that paid him as much or more than his base salary.[5]

---

[4] Specifically the NDA states that Huber must not:
3.1.1    Carry on a business competitive with the Business;
3.1.2    Compete with the Company to supply goods or services to a person who was a customer of the Company during Employment or for 12 months after the Employment ends;
3.1.3    Compete with the company in a tender, received or answered by the Company during the Employment of for 12 months after the Employment ends; to supply goods or services;
3.1.4    Act as an advisor, consultant, employee, agent, company officer or manager of a person who does anything specified in any previous paragraph of this sub-clause during Employment or for 12 months after the Employment ends.

[5] As relevant to this appeal, subsections 3.2.1 and 3.2.2 provide:
3.2.1    If, at any time in the specified 12 months from termination as per 3.2, the employee is employed with another employer, or acts as a consultant or agent in the timeframe as outlined in 3.2, from which the employee derives any form of compensation equal to, or in excess of the base salary at the time of termination, the payment as prescribed in 3.2 will cease.

Huber contends that that the twelve months' pay provided for in section 3.2 was not conditioned on compliance with the non-competition conditions in sections 3.1.1 through 3.1.4 because there is no express language tying the payment to the non-competition conditions. LFUSA argues that the twelve months' pay was intended to be conditioned on compliance with the non-competition conditions in section 3.1 because it was incorporated under Section 3 which is titled "NON COMPETITION."

Although the payment and non-competition clauses are within the same section, no language in section 3.2 expressly conditions the twelve months' pay on compliance with the non-competition conditions. Additionally, the NDA specifies that headings do not affect interpretation, implying that the parties did not intend provisions within the same section to be interpreted together absent express language. The only term in section 3.1 expressly incorporated into section 3.2 is the twelve-month time frame.

Presumably, if the parties had intended the twelve months' pay to be conditioned on non-competition, the NDA would have expressly incorporated such a condition. This is particularly true where the parties did include express conditions under section 3.2. Under the maxim *expressio unius est exclusion alterius*, "the expression in a contract of one or more things of a class implies the exclusion of all not expressed." *Ace Realty, Inc. v. Anderson*, 106 Idaho 742, 749, 682 P.2d 1289, 1296 (Ct. App. 1984) (internal citation and quotation marks omitted). The NDA provides that Huber would not receive the twelve months' pay if he were terminated for performance issues or summarily dismissed. Additionally, sections 3.2.1 and 3.2.2 provide that the payments would end or be reduced if Huber obtained other employment within the twelve month period. The inclusion of these express conditions implies the exclusion of all other conditions not expressed. Accordingly, the express terms of the NDA do not evidence a mutual intent to condition the twelve months' pay on compliance with the non-competition conditions.

Rather, section 3.2 seems intended to provide a severance payment. A severance payment is meant to "provide a salary substitute to secure the employee's economic well-being during [a] period of unemployment." *Parker*, 140 Idaho at 520, 96 P.3d at 621 (internal citation omitted).

---

. . . .
3.2.2    If the compensation derived by the new employer, consultancy or agent arrangement is less than the employee's base salary at the time of termination, the employer will pay the difference between the compensation the employee receives from their new employment, consultation and/or agent arrangement and the base salary effective at the time of termination for the remainder of the 12 month period.

Here, section 3.2 specifically provides that, as long as Huber is not terminated for performance issues or summarily dismissed, Huber would receive comparable compensation to his base salary for twelve months, even if Huber obtained other employment during that period. This provision seems intended to secure Huber's economic well-being.

Based on a plain reading of the terms of the NDA, the twelve months' pay is not conditioned on compliance with the non-competition conditions. Rather, it unambiguously provides for a severance payment that is intended to compensate Huber for his past service and secure his economic well-being. As this Court found in *Johnson*, severance pay constitutes wages under the IWCA because it is "a component of the compensation bargained for in the agreement of employment." 106 Idaho at 367, 679 P.2d at 644.

We reverse the district court ruling that the amount owed under the NDA was not wages under the IWCA, and remand for the district court to treble the $180,000 judgment under Idaho Code section 45-615. Post-judgment interest shall accrue on the trebled amount of $540,000 from December 10, 2013, the date of entry of the judgment. *Whitlock v. Haney Seed Co.*, 114 Idaho 628, 635, 759 P.2d 919, 926 (Ct. App. 1988).

**2. The district court abused its discretion by not awarding prejudgment interest prior to August 2013.**

After the district court entered judgment in favor of Huber for $180,000, Huber moved to amend the judgment to include prejudgment interest. The district court awarded prejudgment interest from August 2013 through December 2013, totaling $7,752.58. The district court found that, although Huber should have received bi-monthly checks during the twelve months after his employment was terminated, the twelve months' pay was conditioned on compliance with the non-competition clause. The non-competition clause required that Huber not compete with LFUSA for twelve months after employment. Therefore, the district court found that the amount owed under the NDA was not due and owing until August 2013—twelve months after Huber's termination became effective. On appeal, Huber contends that the payments were not conditioned on compliance with the non-competition clause and that the prejudgment interest should have been calculated from the date of Huber's termination or from the date each severance payment came due and went unpaid.

As found above, the twelve months' pay was not conditioned on compliance with the non-competition clause. The district court, therefore, had no basis to conclude that the $180,000

did not become due until August 2013.[6] As the district court found, Huber should have received bi-monthly payments during the twelve months after termination. The district court, therefore, abused its discretion by not awarding prejudgment interest prior to August 2013.

We vacate the district court's award of prejudgment interest and remand to the district court to award Huber prejudgment interest from the date when each bi-monthly payment came due and went unpaid.

**3. The district court did not err in ruling that the CSO was a "top hat" plan under ERISA and, therefore, exempt from ERISA's vesting and anti-forfeiture provisions.**

On summary judgment, the district court held that the CSO was a top hat plan and, therefore, exempt from ERISA's vesting and anti-forfeiture provisions. The parties disagree as to whether the determination that the CSO is a top hat plan is an issue of law subject to de novo review or a mixed issue of law and fact. No court has directly expressed the standard an appellate court applies when reviewing a district court's determination of whether a plan meets the definition of a top hat plan. However, the Sixth Circuit has implied that the issue is a question of law subject to de novo review. *Daft v. Advest, Inc.*, 658 F.3d 583, 594 (6th Cir. 2011) (concluding that a district court reviews de novo "a plan administrator's determination of questions of law, such as whether a plan meets the statutory definition of a top-hat plan."). Additionally, "the appropriate standard of review is not simply a consequence of the substance of the underlying dispute," but rather, "this Court must consider the procedural posture in which a case arrives for review to decide the standard of review." *Goodman v. Lothrop*, 143 Idaho 622, 625, 151 P.3d 818, 821 (2007). Here, the district court ruled that the CSO was a top hat plan on summary judgment. Therefore, we review the district court's determination that the CSO is a top hat plan de novo, applying the standard for summary judgment. *Trotter v. Bank of N.Y. Mellon*, 152 Idaho at 842, 845–46, 275 P.3d 857, 860–61 (2012).

The parties agree that the CSO is a deferred compensation plan governed by ERISA. ERISA applies to any employee benefit plan not within certain enumerated exceptions. As relevant here, top hat plans are exempt from ERISA's vesting and anti-forfeiture provisions [29

---

[6] LFUSA argued that prejudgment interest should not be added because the amount of Huber's salary was in dispute. However, the parties agreed prior to trial that Huber's salary was $180,000. "[D]amages are unascertainable where some factor necessary to calculate the amount of damages must be determined by a trier of fact." *Ross v. Ross*, 145 Idaho 274, 277, 178 P.3d 639, 642 (Ct. App. 2007). Contrastingly, "[a] claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." *Id.* (internal citation omitted). As found by the district court, the parties agreed that Huber's salary was $180,000 and, therefore, the amount owed was certain and exact.

U.S.C. §§ 1051–1061]. *See* 29 U.S.C. § 1051(2). If the CSO is a top hat plan, the goodwill benefit was forfeitable if Huber were terminated for unsatisfactory performance. If the CSO is not a top hat plan, the anti-forfeiture provisions of ERISA apply and the benefit became non-forfeitable after six years of service. *See* U.S.C. § 1053(a)(2)(B). Top hat plans are defined as "unfunded and . . . maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). Huber does not dispute that he was a highly compensated employee. The only issue on appeal is whether the plan was unfunded.

ERISA does not specifically define the term "unfunded" and neither this Court nor the Ninth Circuit has addressed the issue.[7] Jurisdictions that have addressed this issue focused primarily on "whether the corporation has set aside funds, separate from its general assets, for payment of plan benefits and whether the beneficiaries have a legal right greater than that of a general, unsecured creditor to the corporation's assets." *In re IT Grp., Inc.*, 448 F.3d 661, 667 (3d Cir. 2006) *as amended* (July 10, 2006).

The Eight Circuit has held that death benefits financed by whole life insurance policies with cash value were funded under ERISA because the employee may look to res separate from the corporation when the contingency occurs that triggers the plan's liability. *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1214 (8th Cir. 1981). Contrastingly, a benefit plan financed by an insurance policy was unfunded where the plan specified that the rights of the beneficiary were solely those of an unsecured creditor. *Belsky v. First Nat'l Life Ins. Co.*, 818 F.2d 661, 663–64 (8th Cir. 1987).

The Second Circuit has adopted a similar standard, holding that,

> the question a court must ask in determining whether a plan is unfunded is: can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?

*Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000) (internal quotation marks omitted) (adopting the standard set forth in *Miller v. Heller*, 915 F. Supp. 651, 660 (S.D.N.Y. 1996)). In *Demery*, the Second Circuit held that a plan was unfunded where the

---

[7] Where the Ninth Circuit has addressed top hat plans, the parties have stipulated that the plan is unfunded or fits within the top hat exception. *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1192 (9th Cir. 2007); *Duggan v. Hobbs*, 99 F.3d 307, 310 (1996).

plan stated that the benefits should be paid out of the employer's general assets and that the employer's promise under the plan should be treated as unfunded and unsecured. *Id.* at 287. Even though the employer had taken life insurance policies out on participating employees and the funds were kept in a separate bank account, the court found that the terms of the plan plainly did not give the plaintiffs a greater legal right to the funds than that possessed by an unsecured creditor. *Id.*

The Fifth Circuit drew from the tests articulated in the Eighth and Second Circuits, but also considered an advisory opinion from the Department of Labor stating that the determination of whether a plan is unfunded requires examination of the surrounding facts and circumstances including the tax consequences of the plan. *See Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 513 (5th Cir. 2002) (citing Op. Dep't. Labor 92–13A (May 19, 1992)). Based on these considerations, the Fifth Circuit held that insurance policies did not fund a welfare benefit plan where the insurance policies were not owned by the participants, the participants were prohibited from making contributions to the plan, and the plan did not intend the participants to incur tax liability when insurance premiums were paid. *Id.* at 514–15.

The forgoing cases demonstrate that "the mere fact that a plan is funded by an insurance policy is not dispositive of a plan's status as funded or unfunded for ERISA purposes." *Id.* at 514. Benefit plans supposedly funded by insurance policies have consistently been found unfunded where the plan document expressly provides that the policy is a general asset of the employer and/or the beneficiary's interests in the policy are no more than that of an unsecured creditor. *See IT Group., Inc.*, 448 F.3d at 669; *Demery*, 216 F.3d at 287; *Belsky*, 818 F.2d at 663–64. Plans have also been found to be unfunded where the participant is not an owner of the policy, made no contributions, and did not incur tax liability for premiums paid. *Reliable Home Health Care*, 295 F.3d at 514–15; *see also Crumley v. Stonhard, Inc.*, 920 F. Supp. 589, 593 (D.N.J. 1996) (holding a plan is unfunded where no contributions are made by the employee or any third party).

Additionally, at least one court has found that a plan is unfunded where a life insurance policy only funds the plan under certain conditions. In *Belka v. Rowe Furniture Corp.*, the District Court for the District of Maryland held that a life insurance policy did not fund a plan where the benefit was payable to the employee upon his retirement, termination, or death, and the insurance policy would only cover the employer's liability when the participant died. 571 F.

Supp. 1249, 1252 (D. Md. 1983). The court in *Belka* distinguished these circumstances from the case in *Dependahl*, because in *Dependahl* the benefit was payable only on the death of the employee and, therefore, the life insurance policy provided an immediate source of funding. *Id*. *Belka* was different than *Dependahl*, in that, in the majority of circumstances "the benefits would have to be paid out of the company's general revenues, at least until the employee's death." *Id.*

In the present case, the district court held that the CSO was unfunded because there was no evidence that the cash value of the life insurance policies was sufficient to cover the goodwill benefit or that the insurance policies would not be available to general creditors. Huber argues that the benefit is funded because the CSO provided that LFUSA would fund the plan through purchasing life insurance and, therefore, Huber could look to res separate from LFUSA's general assets. LFUSA contends that the plan is unfunded because Huber did not pay taxes on any of the premiums paid under the insurance policies and the insurance policies only funded the benefit in the case of death, illness, or incapacitation, not if Huber retired or was terminated for reasons besides unsatisfactory performance.

The CSO provides that, in exchange for Huber's long term employment and loyalty, he is to receive 30% (maximum) of company goodwill over a six year period commencing with 5% for the year 2000. The CSO also provides specific circumstances that will trigger Huber's right to collect the goodwill benefit:

> a) Death, ill health or incapacitation of Jeff Huber – LFUSA [will] take out insurance cover to the value of $1,000,000 on Jeff Huber. At the time Jeff Huber is paid via this insurance policy using his goodwill value, this is determined by two independent valuations . . . the remaining value of the insurance policy dividends after Jeff Huber's goodwill [is] paid belongs to LFUSA as the owner of the policy.
> b) If Jeff Huber elects to leave voluntarily, or employment is terminated due to unsatisfactory performance, then all goodwill is lost.
> c) If Jeff Huber retires at a reasonable age and NO sale of business is pending he shall be given the option of exchanging the goodwill accumulated for shares in the company to the value calculated to be the equivalent to goodwill at the time

In 2003, Huber, on behalf of LFUSA, did purchase a term life insurance policy on himself, naming LFUSA the owner and fifty-percent beneficiary of the policy and Huber's parents collectively as a fifty-percent beneficiary. In 2006, Huber modified the policy, reducing the term life policy to $750,000 and turning the remaining $250,000 into a whole life policy. The whole life policy names LFUSA and Huber as owners and LFUSA and Huber's wife each as

16

fifty-percent beneficiaries. Huber argues that this case is most similar to *Dependahl* because the $250,000 policy was a whole life policy with a cash value and the insurance policies constitute separate res which Huber could look to, to fund the goodwill benefit. Additionally, Huber argues that, unlike other cases where a plan has been found to be unfunded, there is no express language in the CSO providing that the life insurance policies are general assets of LFUSA or that Huber's rights are the same as the rights of an unsecured creditor.

Although Huber is identified as an owner in the whole life policy and would have rights in that policy more than an unsecured creditor, the express terms of the CSO provide that LFUSA was to be the owner of any insurance policy taken out on Huber. Under the terms of the CSO, Huber was not meant to be an owner of the insurance policy or have any right in the insurance policy greater than an unsecured creditor. Additionally, much like *Belka*, the life insurance policies would only fund the CSO benefit in rare circumstances.

The CSO expressly provides that the insurance policies will fund the benefit in the case of death, ill health or incapacitation. However, if Huber retired at a reasonable age or were terminated for reasons other than unsatisfactory performance he would receive the value of the benefit by trading in the value of the goodwill for shares in LFUSA. This case is similar to *Belka*, where, although the plan would be funded by an insurance policy in certain circumstances, "in the ordinary case, the payment of the benefits to an employee . . . would be made out of the employer's general assets." *See Belka,* 751 F. Supp. at 1252.

Here, Huber does not contest that under the terms of the CSO the insurance policy would only fund the plan in certain circumstances. Rather, Huber contends that the Court should not follow *Belka* because a plan should not be considered "unfunded" under ERISA if it is partially funded. Alternatively, Huber argues that *Belka* is not on point because the plan in that case included language stating that the employee had no right to the insurance benefit. Huber provides no authority to support his position that if a benefit plan is partially funded it cannot be unfunded for the purposes of ERISA. The court in *Belka* did find that the plan expressly provided that employees had no rights in the policy. However, this finding in no way formed the basis of the court's holding that the plan was unfunded because, except in the event the participant died, the benefit would have to be paid out of the company's general assets. *Id.*

17

It is undisputed that the CSO provides that the insurance policy would only cover LFUSA's liability in the case of Huber's death, illness or incapacitation.[8] Under all other circumstances, Huber was to be paid out of the general assets of the company. Like in *Belka*, there was no res separate from the general assets of LFUSA to fund the benefit in the case of retirement or termination, and Huber's interest in those assets was no greater than that of an unsecured creditor. Additionally, under the terms of the CSO, Huber was not intended to have an interest greater than that of an unsecured creditor in either the term life or whole life insurance policies. Therefore, we hold that the CSO was unfunded.

We affirm the district court's ruling on summary judgment that the CSO was a top hat plan under ERISA, and, therefore, exempt from ERISA's vesting and anti-forfeiture provisions.

### 4. The district court did not err in ruling that the CSO's forfeiture clause was enforceable and that Huber forfeited the benefit by being terminated for unsatisfactory performance.

At trial, the parties litigated whether Huber had been terminated for "unsatisfactory performance" and, therefore, forfeited the goodwill benefit under the CSO. The district court held that Huber forfeited the goodwill benefit under the CSO because a reasonable person would find that Huber's failure to address production issues, management style, demeanor, and unprofessional treatment of LFUSA employees collectively amounted to unsatisfactory performance. On appeal, Huber argues that the CSO's forfeiture provision is unenforceable under federal common law. Additionally, Huber argues that the district court applied the wrong standard to determine whether Huber was fired for unsatisfactory performance and that its determination was not supported by substantial evidence. Lastly, Huber contends that, even if he was terminated for unsatisfactory performance, the district court erred in holding that the entire benefit was forfeited.

"Top hat plans are 'employee benefit plans' within the meaning of ERISA." *Carr v. First Nationwide Bank*, 816 F. Supp. 1476, 1486 (N.D. Cal. 1993). Although top hat plans are not subject to many of the substantive provisions of ERISA regarding forfeiture, vesting, funding and fiduciary duties, these plans "remain subject to the enforcement provisions of ERISA

---

[8] It should be noted that the policy actually purchased by Huber on behalf of LFUSA was a term life insurance policy, which certainly would not have provided any source of payment based upon Huber's illness or incapacitation. The provision goes on to say that when "Jeff Huber is paid via this insurance policy using his goodwill value, this is determined by two independent evaluations." It is not entirely clear how Huber could be paid for the goodwill value out of a policy that only pays a benefit in the event of his death.

18

codified at 29 U.S.C. § 1132(a)." *Id.* Under § 1132(a), a participant in an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

"The forfeitability of top hat plan benefits is governed by federal common law." *Tyco Int'l., Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 565 (S.D.N.Y. 2010). ERISA does not provide substantive guidance on interpreting and enforcing top hat benefit plans. "Instead, Congress intended for the courts, borrowing from state law where appropriate, and guided by the policies expressed in ERISA and other federal labor laws, to fashion a body of federal common law to govern ERISA suits." *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1502 (9th Cir. 1985). As discussed at length by the Ninth Circuit in *Menhorn v. Firestone Tire & Rubber Co.*, "Congress viewed ERISA as a grant of authority to the courts to develop principles governing areas of the law relating to employee benefit plans that had previously been the exclusive province of state law." 738 F.2d 1496, 1499 (9th Cir 1984).

First, Huber argues that under federal common law the forfeiture provision in the CSO is unenforceable because federal courts subject forfeiture clauses to a rigorous reasonableness test whenever the substantive non-forfeiture provisions of ERISA are not applicable. According to Huber, the forfeiture clause is unenforceable because the triggering event, termination for unsatisfactory performance, does not provide objective criteria and is too broad. Huber relies on *Hollenbeck v. Falstaff Brewing Corp.*, where the Eastern District of Missouri considered whether to enforce a forfeiture, or "bad boy," clause in a benefit plan that accrued after January 1, 1975, when ERISA became effective, but before January 1, 1976, when ERISA's anti-forfeiture provision, 29 U.S.C. § 1053, became effective. 605 F. Supp. 421, 427–28 (E.D. Mo. 1984) *aff'd*, 780 F.2d 20 (8th Cir. 1985). The court found that "[i]n enacting ERISA, Congress was deeply concerned over the use of such 'bad boy' clauses to forfeit an employee's vested ERISA benefits" and "[i]n accordance with Congress' strong policy . . . courts have subjected bad boy clauses to a rigorous reasonableness test whenever the substantive non-forfeiture provisions of ERISA are not applicable." *Id.* at 428. Importantly, the court in *Hollenbeck* was not dealing with a top hat plan, but with a plan that accrued before the anti-forfeiture provisions of ERISA took effect. The court in *Hollenbeck* essentially found that, even though § 1053 was not applicable in that case, the policies underlying the provision should guide the application of federal common

law. However, those same policy concerns are not present when dealing with a top hat plan, which is expressly exempt from ERISA's anti-forfeiture provisions. *See* 29 U.S.C. § 1051(2).

Congress intentionally exempted top hat plans from the anti-forfeiture provisions of ERISA because such plans are for high-ranking employees and "executives are assumed to have a strong enough bargaining position when negotiating these plans to obtain the inclusion of a nonforfeitability provision if they wish to do so." *Tyco*, 756 F. Supp. 2d at 565. In *Bigda v. Fishbach Corp.*, the District Court for Southern District of New York held that federal common law may not be used to create nonforfeitability protection for top hat plans. 898 F. Supp 1004, 1016 (S.D.N.Y. 1995) *aff'd*, 101 F.3d 108 (2d Cir. 1996). The court reasoned that

> Courts use federal common law to fill in the interstices of ERISA's statutory scheme [in] deciding claims that are allowed by ERISA but where ERISA does not provide substantive law. The failure of ERISA to provide nonforfeitability coverage to top hat plans is not an "interstice" because it is the result of a deliberate decision to let executives use their positions of power to negotiate such protection for their plans on their own. Federal common law must further the purposes of the statute under which it is used; it may not be used to re-write the federal statute.

*Id.* (internal citations and quotations omitted). Following the reasoning in *Bigda*, another federal district court also rejected an argument that a forfeiture clause in a top hat plan was "unreasonably overbroad" under federal common law. *Bryan v. Pep Boys-Manny, Moe & Jack,* No. CIV.A. 00-1525, 2001 WL 752645, at *4 (E.D. Pa. June 29, 2001). Huber has not provided any authority to support the proposition that the holding in *Hollenbeck* is applicable to top hat plans. The application of federal common law to create non-forfeiture protection would be contrary to ERISA's express exemption of top hat plans from such protection. Therefore, we hold that the CSO's forfeiture provision is enforceable under federal common law.

Second, Huber argues that the district court applied the wrong standard to determine whether he was terminated for unsatisfactory performance and, alternatively, that there was not substantial evidence to support the district court's holding. Whether Huber forfeited the goodwill benefit under the CSO is governed by contract principles, applied as a matter of federal common law. *See Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281, 287 (3d Cir. 1995). The federal common law in this area is guided by contract principles usually developed by state law, keeping in mind the policies underlying ERISA. *Scott*, 754 F.2d at 1502. Idaho contract law is instructive here, as Idaho courts apply "the general rules of contract law subject to certain special canons of

construction." *Clark v. Prudential Prop. and Cas. Ins. Co.*, 138 Idaho 538, 540, 66 P.3d 242, 244 (2003).

The determination of whether a contract is ambiguous is a question of law. *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 361, 93 P.3d 685 692 (2004). "When the language of a contract is clear and unambiguous its interpretation and legal effect are questions of law." *Id.* Where terms of a contract are "reasonably subject to differing interpretations, the language is ambiguous and its meaning is a question of fact." *Clark*, 138 Idaho at 541, 66 P.3d at 245. "To determine the meaning of an ambiguous contract, the trier of fact must determine what a reasonable person would have understood the language to mean and the words used must be construed given their ordinary meaning." *Id.*

Here, the CSO's forfeiture clause provides that if Jeff Huber elects to leave voluntarily, or if his employment is terminated due to unsatisfactory performance, then all goodwill is lost. The district court concluded that the phrase "unsatisfactory performance" was ambiguous because it was not defined in the CSO. The district court then concluded that whether Huber was terminated for unsatisfactory performance would be determined by whether or not a reasonable person would find Huber's performance to be unsatisfactory.

The meaning of the phrase "unsatisfactory performance" is subject to differing interpretations. Without any guidance within the four corners of the CSO, the district court properly concluded that the phrase was ambiguous. The court then articulated the appropriate standard for determining the meaning of an ambiguous phrase. Huber argues that the district court should have applied a more rigorous "reasonable businessman" standard articulated in *Hollenbeck*. However, as discussed above, *Hollenbeck* is not applicable to forfeiture clauses in top hat plans. Therefore, the district court did not err in applying the reasonable person standard to determine the meaning of the phrase "unsatisfactory performance."

Additionally, there was substantial evidence to support the district court's finding that Huber was terminated for unsatisfactory performance. The August 3, 2011, letter from Leniger-Sherratt to Jeff Huber documented several performance-related issues that justified Huber's termination. The letter provided that Huber was terminated based on (1) his inability to promote an open and transparent organization regarding accurate reporting and factual information sharing with the Board; (2) his instructing Coleman to falsify the backorder report in 2010; and (3) his treatment of LFUSA staff which put LFUSA at risk of losing a large number of key

21

personnel. At trial, Coleman and Leniger-Sherratt testified that Huber ordered Coleman to falsify the back order report in 2010, that he micromanaged, and that he was demeaning toward staff. Additionally, the district court heard testimony that several key employees threatened to quit if Huber returned to work in 2011. The district court found this testimony to be credible. Based on the foregoing evidence, the district court found that Huber did berate, belittle, and harass employees, and that his demeanor and management style were unprofessional and directly interfered with the business operations of LFUSA. Additionally, the district court found that Huber's management as vice president was unprofessional given the significant backorders in 2010, his failure to address the issue, and his directing staff to present false information to the LFA board.

Huber argues that the above complaints did not actually result in Huber's termination because these actions took place in 2010 and 2011 and Huber's termination was not effective until August 2012. However, based on the above evidence, the district court found that the timing of Huber's termination was dictated by the other employees' threats that they would quit if Huber returned from his two-month vacation in 2011, but the actual reasons for his termination were an accumulation of factors summarized in the August 3, 2011 letter. "A trial court's findings of fact in a court tried case will be liberally construed on appeal in favor of the judgment entered, in view of the trial court's role as trier of fact." *Benninger v. Derifield*, 142 Idaho 486, 489, 129 P.3d 1235, 1238 (2006). Here, there was substantial evidence to support the district court's conclusion that a reasonable person would find that Huber's management style, demeanor, unprofessional treatment of LFUSA employees, and actions as vice-president collectively amounted to unsatisfactory performance.

Lastly, Huber contends that the district court erred in holding that the entire benefit was forfeited. Huber argues that, under federal common law, an employer is only entitled to withhold top hat plan benefits that accrued during the period of the employee's disloyalty. *Id.* In support of this position Huber relies on *Tyco*, 756 F. Supp. 2d 553, and *Aramony v. United Way Replacement Benefit Plan*, 28 F. Supp. 2d 147 (S.D.N.Y. 1998) *rev'd in part*, 191 F.3d 140 (2d Cir. 1999). *Id.* Huber's reliance on these cases is misplaced. In *Tyco*, the District Court of Southern District of New York held that benefits in a top hat plan "are assumed to be forfeitable unless otherwise agreed to by the parties to the contract." 756 F. Supp. 2d at 565. The court found that even where a top hat plan lacked an express forfeiture clause, the beneficiary could

22

still forfeit the benefit for wrongdoing, but only for those benefits accrued during the employee's disloyalty. *Id. Tyco*'s holding is limited to implied forfeiture clauses, and has no application here, where the CSO contained an express forfeiture provision. *Aramony* does not even address the issue of whether benefits accrued before the period of misconduct can be forfeited, but merely holds that an employee can breach the implied duty of good faith by engaging in acts of disloyalty. 28 F. Supp. 2d at 172.

Here, the CSO expressly provided that if Huber was terminated for unsatisfactory performance "all goodwill is lost." Huber's argument that he should receive all of the goodwill earned before the period of his misconduct is in essence saying that his right to the goodwill "vested" before the misconduct began. Top hat plans are expressly exempt from the vesting provisions of ERISA. 29 U.S.C. § 1051(2). "Federal common law must further the purposes of the statute under which it is used; it may not be used to re-write the federal statute." *Bigda*, 898 F. Supp. at 1016. For the same reason that federal common law cannot provide non-forfeiture protection for top hat plans, it cannot be used to grant vesting protection to avoid forfeiture. *See United States v. Graham*, No. CIV.A. 03-80504, 2007 WL 1806174, at *2 (E.D. Mich. June 21, 2007) (holding that the argument that a forfeiture clause in a top hat plan is not enforceable because the benefits vested runs contrary to the law). Under the terms of the CSO, Huber forfeited all of the goodwill benefit by being terminated for unsatisfactory performance.

We affirm the district court's ruling that Huber forfeited the goodwill benefit under the CSO because he was terminated for unsatisfactory performance.

**5. The district court did not abuse its discretion by dismissing Huber's equity claim or denying Huber's motion to amend his complaint to conform to the evidence.**

During closing arguments at trial, Huber argued that the court should grant him an equitable share of the goodwill even if he was not entitled to the 30% provided for in the CSO. The court denied relief, stating that Huber had not pled equitable relief and, even if he had, Huber had received adequate compensation for his past service. Huber later moved to amend the pleadings to conform to the evidence and to incorporate the claim for equitable relief, which the district court also denied. Huber argues that he did plead equitable relief and that the district court erred in refusing to hear his claim or, alternatively, that the district court abused its discretion in not allowing him to amend his complaint to include the equity claim.

The district court acted within its discretion in denying Huber's claim for equitable relief. Huber did not expressly plead equitable relief under the CSO in either his complaint or amended

complaint. Huber seems to contend that he pled equitable relief because both his complaint and amended complaint included a request for "such other and further relief as this Court deems just and proper." Such boilerplate language is not sufficient to put LFUSA on notice that Huber would seek an equitable portion of the goodwill benefit at trial.

Nor did the district court err in denying Huber's motion to amend his complaint. The district court found that the plaintiff had not pled equitable relief in his complaint and that the parties never agreed to try the issue. Additionally, the district court found that Huber's claim for equitable relief was unsupported by evidence because no evidence was presented at trial to indicate what the value of the equitable share would be. Because the amendment was not supported by the evidence presented at trial, the district court did not err in denying the amendment. *See Valentine v. Rosenhaupt*, 19 Idaho 130, 130, 122 P. 685, 686 (1910).

We affirm the district court's orders denying Huber's claim for equitable relief and denying Huber's motion to amend his complaint to conform to the evidence.

**6. The district court abused its discretion in awarding LFUSA costs under I.R.C.P. 54(d)(1) and attorney fees under Idaho Code section 12-120(3).**

After trial, both parties moved for an award of attorney fees under ERISA and Idaho Code section 12-120(3), and for an award of costs under Idaho Rule of Civil Procedure 54(d)(1). The district court held that LFUSA was the prevailing party under Idaho Rule of Civil Procedure 54(d)(1)(B) and awarded LFUSA $264,000 in attorney fees under Idaho Code section 12-120(3). The district court reasoned that Huber prevailed on his claim under the NDA, but LFUSA prevailed on the much larger and more litigated issues regarding the top hat status of the CSO and whether Huber was terminated for unsatisfactory performance. Although the district court awarded LFUSA attorney fees under Idaho Code section 12-120(3), it also held that neither party should be awarded attorney fees under ERISA. The district court reasoned that to award attorney fees to LFUSA would be contrary to one of the purposes of ERISA—to not discourage employees from filing claims against their employers. Additionally, the district court awarded LFUSA $15,584.51 in costs as a matter of right and $4,880.25 in discretionary costs under Idaho Rule of Civil Procedure 51(d)(1).

On appeal, Huber contends that the district court abused its discretion in finding that LFUSA, not Huber, was the prevailing party under Idaho Rule of Civil Procedure 54(d)(1)(B) and in awarding LFUSA fees and costs under Idaho Code section 12-120(3) and Idaho Rule of Civil Procedure 54(d)(1). The thrust of Huber's argument is that the district court erred in

considering the ERISA claims when awarding fees and costs under state law, because ERISA has its own attorney fee provision and preempts state law on this issue.

Idaho Code section 12-120(3) provides that "[i]n any civil action to recover on a[] . . . contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction . . . the prevailing party shall be allowed a reasonable attorney's fee to be set by the court." The same "prevailing party" standard applies to awards of attorney fees under Idaho Code 12-120(3) and an award of costs under Idaho Rule of Civil Procedure 54(d)(1). *Oakes v. Boise Heart Clinic Physicians, PLLC*, 152 Idaho 540, 545, 272 P.3d 512, 517 (2012).

> In determining which party to an action is a prevailing party and entitled to costs, the trial court shall in its sound discretion consider the final judgment or result of the action in relation to the relief sought by the respective parties. The trial court in its sound discretion may determine that a party to an action prevailed in part and did not prevail in part, and upon so finding may apportion the costs between and among the parties in a fair and equitable manner after considering all of the issues and claims involved in the action and the resultant judgment or judgments obtained.

Idaho R. Civ. P. 54(d)(1)(B).

Generally, the prevailing party question is examined and determined from an overall view, not on a claim-by-claim basis. *Shore v. Peterson*, 146 Idaho 903, 914, 204 P.3d 1114, 1125 (2009). "This Court has held that when both parties are partially successful, it is within the district court's discretion to decline an award of attorney's fees to either side." *Oakes*, 152 Idaho at 545, 272 P.3d at 517. Usually the district court has discretion to consider all of the claims together when determining whether either party prevailed under Rule 54(d)(1)(B). However, federal preemption imposes some limitations when an ERISA claim is involved.

The Ninth Circuit has held that "ERISA preempts an award of attorney's fees for work done in an ERISA action when those fees are determined according to the standards of a state statute and the state standards differ from the standards that are applicable under ERISA." *S. F. Culinary, Bartenders & Service Emp. Welfare Fund v. Lucin*, 76 F.3d 295, 297 (9th Cir. 1996). The Ninth Circuit considers five factors in determining whether to award attorney fees under ERISA:

> (1) the degree of the opposing parties' culpability or bad faith;
> (2) the ability of the opposing parties to satisfy an award of fees;
> (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances;

(4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and

(5) the relative merits of the parties' positions

*Id*. (citing *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980)). These factors "very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs." *Id.* (internal quotation marks omitted).

ERISA does not forbid an award of attorney fees for an ERISA claim under a state statute in all circumstances. The issue arises where the district court awards attorney fees under the state statute and the fees would otherwise be unavailable under ERISA. As found by the court in *Lucin*:

> the district court's decision to apply a state statute and grant the defendant's attorneys' fees for work done in the underlying ERISA action notwithstanding the fact that both the district judge and this court had previously determined that the defendants were not entitled to recover such fees under ERISA cannot stand.

*Id.* at 298.

Here, the district court found that LFUSA was the prevailing party under Rule 54(d)(1)(B) because LFUSA prevailed on the most crucial issues of the trial: whether the CSO was a top hat plan and whether Huber forfeited the goodwill by being terminated for unsatisfactory performance. These issues were encompassed in Huber's claim that LFUSA violated ERISA by denying him the goodwill benefit under the CSO. LFUSA argues that the district court did not err in considering the ERISA claims because the standard set forth in Idaho Code section 12-120(3) is not in conflict with the standard under ERISA. However, the district court expressly found that LFUSA would not be entitled to attorney fees under ERISA because awarding fees would run contrary ERISA's purpose not to discourage employees from filing claims against their employers. Similar to the situation in *Lucin*, the district court could not, within its discretion, consider the ERISA claim or award attorney fees for the ERISA claim under Idaho Code section 12-120(3) after it determined that attorney fees would not be available to LFUSA under ERISA. "If a litigant were permitted to resort to a state statutory procedure to reach around ERISA's attorneys' fees provisions for fees on an ERISA claim, the purposes of the ERISA provision would be severely undermined." *Id*.

Alternatively, LFUSA argues that this court should uphold the district court's award by reconsidering whether LFUSA is eligible for fees under ERISA. "It is well established that this

26

Court will use the correct legal theory to affirm the correct decision of a district court even when it is based on an erroneous legal theory." *J.R. Simplot Co. v. Idaho State Tax Comm'n*, 120 Idaho 849, 853, 820 P.2d 1206, 1210 (1991). LFUSA contends that an award of attorney fees to LFUSA would be appropriate under ERISA because attorney fees have been awarded against ERISA plaintiffs who held executive positions.

In an action brought under 29 U.S.C. § 1132, a court "in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C § 1132(g)(1). As laid out above, the Ninth Circuit considers several factors in determining whether to award attorney fees in a specific case, including: the merits of the parties' positions, whether the parties acted in bad faith, and the possible deterrent effect of awarding fees. *Lucin*, 76 F.3d at 297. Most often, "these factors weigh against awarding fees against an ERISA plaintiff." *Id.* The cases cited by LFUSA strengthen that conclusion.

In two of the cases cited by LFUSA, the court awarded attorney fees against plaintiffs who were found to act in bad faith. *Feinstein v. Saint Luke's Hosp.*, No. CIV.A. 10-4050, 2012 WL 4364641, at *4 (E.D. Pa. Sept. 25, 2012*); Epstein v. Unum Life Ins. Co. of Am.,* No. CV 04-0400 SVW, 2004 WL 2418310, at *3 (C.D. Cal. Oct. 13, 2004). In the final case cited by LFUSA, the Ninth Circuit upheld an award of fees against an ERISA plaintiff where the plaintiff did not act in bad faith, but the claim was found to have no merit and the district court had limited the award to ten percent of the requested fees. *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 408 (9th Cir. 1997) (internal quotation marks omitted). As discussed in Judge Noonan's dissent, this award was unusual, as no other case had awarded fees against an ERISA plaintiff who had not engaged in culpable conduct. *Id.* at 409 (Noonan, J. dissenting).

In the present case, there has been no allegation that Huber brought the ERISA claim in bad faith. Additionally, although Huber did not prevail in his ERISA claim, it was not without merit. The law concerning whether a plan is unfunded under ERISA is not well settled and whether Huber forfeited the benefit for being terminated for unsatisfactory performance was a close question of fact. Under these circumstances, an award of fees against an ERISA plaintiff could deter future ERISA plaintiffs from pursuing meritorious claims. Therefore, as found by the district court, LFUSA is not entitled to fees under ERISA.

Where attorney's fees would not be available under ERISA, the district court abused its discretion by considering the ERISA claim in determining whether Huber or LFUSA was the

prevailing party under Idaho Code section 12-120(3) and Rule 54(d)(1). Additionally, the district court abused its discretion by including attorney fees and costs incurred in litigating the ERISA claim in its award of fees and costs under state law.

We vacate the district court's award of attorney fees and costs to LFUSA, and remand for further proceedings.

**7. Neither Huber nor LFUSA are entitled to attorney fees on appeal.**

Both Huber and LFUSA requested attorney fees on appeal. LFUSA requests attorney fees under Idaho Appellate Rules 40 and 41, Idaho Code sections 12-121 and 12-120(3), and 29 U.S.C. § 1132(g). Huber requests attorney fees under Idaho Code sections 12-120(3) and 45-615, and 29 U.S.C. § 1132(g)(1).

Courts have construed 29 U.S.C. § 1132(g)(1) to allow attorney fees on appeal. *See, e.g., Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc.*, 911 F.2d 1347, 1356 (9th Cir. 1990). To be eligible for an award of fees under § 1132(g)(1), a party does not have to be a prevailing party but must have achieved some degree of success on the merits. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254 (2010). On appeal, Huber did not succeed on any issues related to his ERISA claim, and, therefore, he is not eligible for an award of fees under § 1132(g)(1).

Although LFUSA did successfully defend the ERISA claim on appeal, the factors set forth in *Lucin* weigh against an award of fees in this case. Huber's appeal of the ERISA claim was not frivolous or brought in bad faith, as the issues brought before this Court were complex and not well settled. Allowing an award of fees against an ERISA plaintiff in this case may chill future ERISA plaintiffs from appealing adverse rulings in close cases. On appeal, LFUSA only prevailed on issues related to the ERISA claim. Because LFUSA is not entitled to fees under ERISA, LFUSA cannot be granted fees under section 12-120(3). *See Lucin*, 76 F.3d at 298. Additionally, we decline to award LFUSA fees under Idaho Code section 12-121 or Idaho Appellate Rules 40 and 41 as both parties prevailed in part on appeal. "Where both parties prevail in part on appeal, this Court may deny fees." *Caldwell v. Cometto*, 151 Idaho 34, 41, 243 P.3d 708, 715 (2011).

There is no evidence on the record that Huber made a demand for past wages in writing. Therefore, he is not entitled to attorney fees under Idaho Code section 45-615. *See Bilow v. Preco, Inc.*, 132 Idaho 23, 31, 966 P.2d 23, 31 (1998). As the payment owed under the NDA is wages under the IWCA, section 45-615 is Huber's exclusive remedy for attorney fees, and he is

not entitled to fees under section 12-120(3). *Id*. at 33, 966 P.2d at 33. Huber's and LFUSA's claims for attorney fees on appeal are denied.

## IV.
## CONCLUSIONS

We affirm the district court in part and reverse in part:

1. We affirm the district court's orders ruling that the CSO is a top hat plan under ERISA and that Huber forfeited the benefit under the CSO.

2. We affirm the district court's orders denying Huber's claim for equitable relief and denying Huber's motion to amend his complaint to conform to the evidence.

3. We reverse the district court's order ruling that the amount owed under the NDA was not wages under the Idaho Wage Claims Act and remand to the district court to treble the $180,000 judgment. Post-judgment interest shall accrue on the trebled amount of $540,000 from December 10, 2013, the date of entry of the judgment.

4. We vacate the district court's award of prejudgment interest to Huber and remand with instructions to the district court to award prejudgment interest from when each bi-monthly payment came due and went unpaid.

5. We vacate the district court's award of attorney fees and costs to LFUSA and remand for further proceedings consistent with this opinion.

6. Neither party is awarded attorney fees or costs on appeal.

Justices EISMANN, BURDICK, W. JONES and HORTON CONCUR.